# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent/Cross-Appellant, | ) | No. 72516-5-I |
| v. | ) | OPINION PUBLISHED IN PART |
| JIMI JAMES HAMILTON, | ) | |
| Appellant/Cross-Respondent. | ) | FILED: October 24, 2016 |

DWYER, J. — "Cross-examination that attempts to impeach by slipping in unrelied on opinions and conclusions without calling the experts to testify is improper." ROBERT H. ARONSON & MAUREEN A. HOWARD, THE LAW OF EVIDENCE IN WASHINGTON § 8.03[8][b], at 8-67 (5th ed. 2016). Such questioning does not fall within the ambit of ER 703, which addresses "facts or data . . . *upon which an expert bases* an opinion or inference." (Emphasis added.) Nor does it fall within the scope of ER 705, which, as to the facts or data upon which an expert bases an opinion, allows that the expert may "be required to disclose the underlying facts or data on cross examination." Indeed, if the purpose of the impeachment attempt is to show that the testifying expert *should have* relied on the "unrelied on opinions" of others, then the "unrelied on opinions" are being offered for their truth and are thus inadmissible hearsay. ER 801(c). On the other hand, if the proponent of the "unrelied on opinions" impeachment attempt is offering the evidence without regard for its truth, then the evidence lacks relevance—

because no expert is required to base an opinion on falsehoods. Irrelevant evidence is likewise inadmissible. ER 401, 402.

In this case, Jimi Hamilton's sole expert witness, Dr. Stuart Grassian, was repeatedly impeached on cross-examination with the observations, opinions, and conclusions—contained in Hamilton's voluminous medical records—of various nontestifying medical professionals. This was allowed notwithstanding that Dr. Grassian did not claim to have relied on these observations, opinions, or conclusions in forming his own opinions. And this was allowed notwithstanding that the medical records themselves were never admitted into evidence. This misapplication of the rules of evidence unquestionably prejudiced Hamilton, whose defense depended solely upon Dr. Grassian's testimony. The improper latitude granted to the State in cross-examining Dr. Grassian calls into question the fairness of the trial. Accordingly, we reverse.

I

Jimi Hamilton was charged with one count of assault in the second degree of a corrections officer (Officer Trout). The assaultive act occurred at the Monroe Correctional Complex where Hamilton was serving a sentence.

At trial, Hamilton testified in his own defense. His defense to the charge was diminished capacity resulting from a mental disease or defect. Hamilton's sole testifying expert witness was a psychiatrist, Dr. Stuart Grassian.[1]

Dr. Grassian's testimony focused on two topics. First, he testified to the general state of mental health services provided to prisoners and to the effect on

---

[1] The State also called only one expert witness, Dr. Claire Sauvagnat, a psychologist.

prisoners of lengthy or repeated periods of solitary confinement.[2] Second, in support of Hamilton's diminished capacity defense, he testified to his opinion that Hamilton suffered from relevant mental illnesses at the time that he committed the assaultive act that gave rise to the charge at issue. The claim of error herein arises from the prosecutor's attempted impeachment of the latter testimony.

*Dr. Grassian's Opinion Testimony*

On direct examination, Hamilton's counsel established that Dr. Grassian formulated his opinion of Hamilton's mental state at the time of the assaultive act by conducting interviews with Hamilton and several of his family members. Dr. Grassian also testified that he reviewed numerous documents, including (1) Hamilton's statement to the police following the assaultive act, (2) the information and affidavit of probable cause filed herein, (3) statements from various witnesses to the incident, (4) the victim's medical records, and (5) Hamilton's medical records. Hamilton's medical records consisted of approximately 2,380 pages.[3]

Dr. Grassian testified, on direct examination, to the overall state of Hamilton's medical records and the quality of the evaluations contained therein. He described the records as "helter-skelter," changing all the time, and often

---

[2] Extensive testimony established that Hamilton had been often so confined.

[3] On direct examination, Hamilton's counsel inquired about the state of Hamilton's medical records:

> [DR. GRASSIAN]: There are a ton of records. And they were actually not in a good order. I mean, they were kind of chaotic to go through.
>
> [DEFENSE COUNSEL]: Do you know what order they were given to you in?
>
> [DR. GRASSIAN]: There were times I couldn't figure out the order. You know, it was apparently straight from the Department of Corrections, and I just couldn't -- there didn't seem to be a logical order to them that I can discern.

incoherent. He acknowledged that there were opinions in the medical records that were well-founded. He also observed, however, that in other parts of the medical records there was no continuing record or accumulation of knowledge, and that many medical professionals who opined therein had nothing to base their information on, forming their observations, opinions, and conclusions regarding Hamilton based on their impressions of the moment. Dr. Grassian also generally criticized evaluations within the medical records for diagnosing Hamilton, without further explanation, as suffering from antisocial personality disorder, borderline personality disorder, or as having a tendency to fake a mental illness.

Thereafter, Dr. Grassian testified to his opinion regarding Hamilton's mental health generally and Hamilton's mental state at the time of the assaultive act. Dr. Grassian opined that Hamilton suffers from bipolar mood disorder, a mental defect presenting volatile emotional changes and episodic periods of psychosis.

Dr. Grassian further opined that, due to this disorder, Hamilton was not able to form the requisite mental state to commit the charged offense. Specifically, Dr. Grassian testified that Hamilton was in a dissociative state—an altered statute of consciousness—at the time of the assaultive act. Based on his opinion that Hamilton was in a dissociative state, Dr. Grassian concluded that Hamilton lacked the capacity to form the intent to commit an injurious act against Officer Trout.

The State, during its cross-examination of Dr. Grassian, inquired as to whether Dr. Grassian had relied on Hamilton's medical records in formulating his opinion. Dr. Grassian responded that he did not rely on the records, stating that the medical records were relevant to his decision-making, but that he did not necessarily make a decision based on the records.

Shortly thereafter, the prosecutor asked Dr. Grassian whether he made a list of the documents on which he had relied when formulating his expert opinion. Dr. Grassian responded that he had previously made a list of the entries in the medical records upon which he had relied, but had been unable to locate it prior to trial. Dr. Grassian further indicated that, due to the large volume of Hamilton's medical records, he was unable to reconstruct the list before he was due to testify and thus could not identify with particularity those entries in Hamilton's records upon which he had relied in formulating his opinions.

*The Prosecutor's Impeachment of Dr. Grassian's Testimony*

During Dr. Grassian's cross-examination, the State attempted to impeach his testimony regarding Hamilton's bipolar mood disorder and Hamilton's mental state at the time in question with the observations, opinions, and conclusions of medical professionals set forth in Hamilton's medical records. The prosecutor's mode of impeachment proceeded as follows: (1) directing Dr. Grassian to a page in Hamilton's medical records containing a different medical professional's observations, opinions, or conclusions that contradicted Dr. Grassian's opinions; (2) identifying or asking Dr. Grassian to identify that medical professional and his or her professional or educational expertise; (3) reading the excerpt from the

entry aloud or asking Dr. Grassian to read therefrom; and (4) demanding that Dr. Grassian substantively respond to the statements therein.

None of the identified medical professionals testified at Hamilton's trial. None of the pages or entries from Hamilton's medical records referenced during Dr. Grassian's cross-examination were admitted as exhibits at trial.

One of the first medical professionals referenced by the prosecutor in attempting to impeach Dr. Grassian's testimony was a psychiatrist, identified only as Dr. Karnik,[4] who recorded evaluations of Hamilton in 1999. Notwithstanding that (1) Dr. Karnik did not testify at trial, (2) the medical records generated by Dr. Karnik were not admitted as exhibits, and (3) Dr. Grassian never indicated that he had relied on Dr. Karnik's opinions, observations, or conclusions in forming his own opinions, the trial court permitted the State to impeach Dr. Grassian with the entries generated by Dr. Karnik.

In particular, the prosecutor read from two entries generated by Dr. Karnik, memorializing Dr. Karnik's belief that Hamilton, in 1999, faked having a mental illness, engaged in polysubstance abuse, presented with a lack of remorse for his wrongful conduct, and failed to assume responsibility for his actions. The prosecutor demanded that Dr. Grassian substantively respond to Dr. Karnik's conclusions and challenged Dr. Grassian as to whether he was more qualified than Dr. Karnik was to evaluate Hamilton's mental health.

---

[4] Dr. Karnik's first name was not vocalized by either the prosecutor or Dr. Grassian at trial. Thus, given that the medical records were never admitted as evidence, the record before us does not indicate Dr. Karnik's full name.

During the second day of Dr. Grassian's cross-examination, the State requested that Dr. Grassian read from a chart note generated by another nontestifying medical professional, identified as Dr. Rolf Kolden. Notwithstanding that (1) Dr. Kolden did not testify at trial, (2) the medical record generated by Dr. Kolden was not admitted as an exhibit, and (3) Dr. Grassian never indicated that he had relied on Dr. Kolden's chart note in forming his opinions, the trial court permitted the prosecutor to attempt to impeach Dr. Grassian's testimony with information recorded by Dr. Kolden.

The purpose of introducing Dr. Kolden's chart note was to impeach Dr. Grassian's testimony with Dr. Kolden's observation that Hamilton was—at the time he saw Dr. Kolden—faking a mental illness in order to improve his situation. The State further questioned Dr. Grassian as to whether Dr. Kolden was a person qualified to make the observations described in the chart note.

The prosecutor additionally referenced a medical record, generated in 2001, by another nontestifying witness, identified phonetically as Dr. Cardell. Even though (1) Dr. Cardell did not testify at trial, (2) the medical record referenced was never admitted as an exhibit, and (3) Dr. Grassian never indicated that he had relied on Dr. Cardell's recorded entry in forming his own opinions, the trial court permitted the State to impeach Dr. Grassian's testimony with information contained in that entry. The purpose of referencing the entry generated by Dr. Cardell was to attempt to impeach Dr. Grassian's testimony with Dr. Cardell's diagnosis that Hamilton—in 2001—did not present symptoms of psychosis but was instead faking a mental illness. The State further queried

- 7 -

Dr. Grassian as to whether Dr. Cardell was a person qualified to make such a diagnosis.

The prosecutor later directed Dr. Grassian to a page in Hamilton's medical records containing a diagnosis made by a fourth nontestifying witness, identified phonetically as Dr. Joseph Dooby. The diagnosis was from 1995. Although (1) Dr. Dooby did not testify at trial, (2) the medical record generated by Dr. Dooby was never admitted as an exhibit, and (3) Dr. Grassian never indicated that he had relied on Dr. Dooby's observations, conclusions, or opinions in forming his own opinions, the trial court permitted the State to attempt to impeach Dr. Grassian's testimony with information contained in the entry generated by Dr. Dooby.

The purpose of introducing Dr. Dooby's chart note was to impeach Dr. Grassian's testimony by contrasting it with Dr. Dooby's diagnosis that Hamilton suffered from antisocial personality disorder, not bipolar mood disorder. The State further questioned Dr. Grassian as to whether Dr. Dooby, who had treated Hamilton when he was still a juvenile, was more qualified to diagnose Hamilton than was Dr. Grassian.

In addition, throughout the cross-examination, the prosecutor referenced the observations, opinions, and conclusions of various other medical professionals, as set forth in Hamilton's medical records, in an attempt to impeach Dr. Grassian's testimony. This included reading information contained in the medical records in front of the jury. These various other professionals were not identified by name either by the prosecutor or Dr. Grassian. As above, these

professionals did not testify at trial, the referenced records were never admitted as exhibits, and Dr. Grassian never indicated that had relied on those record entries in forming his own opinions.

*Defense Counsel's Objections, the Prosecutor's Response, and the Trial Court's Rulings*

Throughout Dr. Grassian's cross-examination, defense counsel repeatedly objected to the State's mode of impeachment. Defense counsel first interjected after the prosecutor began attempting to impeach Dr. Grassian's diagnosis with information contained in Hamilton's medical records. Defense counsel asserted that the statements were hearsay, indicating that she was "objecting to the line of questioning on both a 705 objection, that it's not a basis for his opinion, and hearsay objection." The prosecutor replied that the information in Hamilton's medical records was exempt from the hearsay rules and that the records were being properly used for impeachment.

The trial court stated that "if this is something he relied on in his diagnosis, I will allow the questions" and that the prosecutor "can ask the questions, but I'm not quite sure where it is at this point that it's still impeachment."

The State continued its cross-examination and continued to recite statements attributed to various medical professionals and contained in Hamilton's medical records. In response, defense counsel began objecting to the prosecutor's method of questioning on the ground that the prosecutor was "testifying" and failing to direct a question to Dr. Grassian. The trial court sustained several of these objections.

Shortly thereafter, the prosecutor again recited from Hamilton's medical records, quoting from another nontestifying medical professional who had attributed a quotation to Hamilton. Defense counsel objected, claiming that the statement constituted double hearsay: "I just want to point out what she's referring to is a doctor quoting a [medical professional] quoting Mr. Hamilton. So it's . . . double hearsay. It's not admissible, Your Honor." Apparently flummoxed by the trial court's previous rulings, defense counsel now requested that the trial court issue a limiting instruction indicating that the observations, opinions, and conclusions contained in the medical records could not be considered for their truth. The prosecutor responded that the information set forth in Hamilton's medical records could be considered for its truth because the information included statements made for the purpose of medical diagnosis or treatment and included statements made by Hamilton that were now being offered against him.

The trial court allowed the prosecutor to continue to impeach Dr. Grassian's testimony in this manner, but issued a limiting instruction to the jury, informing the jurors that the observations, opinions, and conclusions in the medical records could not be considered for the truth of the matters asserted therein and could only be considered for the purpose of evaluating the credibility of Dr. Grassian's diagnosis.[5]

---

[5] The trial court ruled that statements made by Hamilton, as recited in his medical records, could be considered by the jury for their truth. The basis for this ruling was that such statements constituted statements of a party opponent. However, the trial court never addressed Hamilton's objection to the second layer of hearsay (i.e., no witness at trial and no admitted exhibit actually asserted that Hamilton made the statements at issue).

The prosecutor then continued the cross-examination and continued framing questions to Dr. Grassian by reading from the medical records. As Dr. Grassian's cross-examination dragged on, defense counsel interposed six separate objections on the basis that the prosecutor herself was "testifying" by reading extensively from the medical records without directing to Dr. Grassian a question to which he could respond. The trial court sustained each objection.

Immediately after Hamilton's sixth such objection, the trial judge excused the jury. Thereafter, Hamilton's counsel noted a continuing objection to the State's line of questioning:

> I continue to have concerns about the style in which [the prosecutor] is asking questions. I am not going to keep objecting, because I look like I'm a jerk when I keep interjecting. I know the Court is taking some action in asking her to ask questions, but I'm noting a continuing objection, and I don't want to have to make that objection continuously in front of the jury.

Also during this exchange, Hamilton himself asserted that the prosecutor was presenting evidence in violation of the hearsay rules. Specifically, Hamilton argued to the trial court that, because the prosecutor was quoting out-of-court statements by a medical professional who, in turn, was quoting Hamilton, the prosecutor was presenting evidence that constituted double hearsay. Hamilton further argued to the trial court that the medical professional's statements were hearsay and that the State "can't use Rule 705 as a bootstrap to relate inadmissible facts and data to this jury."

The prosecutor replied that, with regard to Dr. Grassian's testimony, she was "entitled to impeach that with the facts that he reviewed, that he considered,

or should have considered when making his statements and his opinions." Notwithstanding that the prosecutor was wrong as to all three of these assertions, the trial court appeared to acquiesce in this view of the law and took no further remedial action in response to the objections raised by Hamilton and his counsel.

Later, because Dr. Grassian's testimony elicited only excerpts from Dr. Grassian's report without its full context, Hamilton's counsel offered the report in its entirety for admission pursuant to ER 106, which permits a party to introduce any other part of a writing introduced by another party, "which ought in fairness to be considered contemporaneously with it." The trial court denied this request.[6]

The jury found Hamilton guilty as charged. The conviction constituted Hamilton's third strike pursuant to Washington's Persistent Offender Accountability Act, RCW 9.94A.570. Accordingly, the trial court sentenced him to a lifetime term of confinement without the possibility of parole.

Hamilton now appeals.

II

To properly analyze the primary issue presented, it is necessary to comprehend that the prosecutor never established that Dr. Grassian actually relied on the various entries in the medical records that the prosecutor repeatedly referenced in her cross-examination. Neither were the medical records themselves admitted into evidence as an exhibit. And none of the medical

---

[6] Hamilton does not challenge the propriety of this ruling on appeal.

professionals, whose observations, opinions, or conclusions—as entered into the medical records—were referenced in front of the jury, actually testified at trial.

The State defended its mode of impeachment by claiming that it was entitled to impeach Dr. Grassian's testimony "with the facts that he reviewed, that he considered, or should have considered when making his statements and his opinions." The State was wrong on all counts.

The method of impeachment engaged in by the prosecutor was at variance with the law in four major respects. First, while it is true that when medical records have been admitted into evidence a testifying medical professional may be questioned about the content of those records, the medical records at issue herein were never admitted into evidence. Second, while it is true that an expert witness may be questioned about the information or data on which the expert relied in forming his or her expert opinions, here the State never established that Dr. Grassian relied on any of the various entries about which it questioned him. Third, given that Dr. Grassian did not testify that he had relied on those entries, if the State was attempting to convince the jury that Dr. Grassian *should have* given importance to those entries, then the State was *necessarily* offering the entries for the truth of that which was asserted therein. Thus, it was improper hearsay testimony. Finally, if the State was—as now claimed—*not* offering the evidence for the truth of that which was asserted therein, then the entries were not relevant—because no expert witness can be impeached based on the expert's refusal to base an opinion on a falsehood. Only by treating the entries as true can they be relevant. And if they are to be

- 13 -

treated as true, they are hearsay. Because Dr. Grassian never claimed to rely on the various entries, ER 703 and ER 705 do not excuse them from the hearsay bar.

Hamilton's counsel initially objected to the State's tactic, claiming that the prosecutor was proffering inadmissible hearsay. However, after it became apparent that the trial court had acquiesced to or adopted the prosecutor's rationale for allowing this manner of impeachment, Hamilton's counsel resorted to objecting that the prosecutor was herself testifying, rather than asking questions.[7] As a consequence, the trial court improperly permitted Dr. Grassian's testimony to be repeatedly impeached with the observations, opinions, and conclusions contained in Hamilton's medical records throughout the two trial sessions during which Dr. Grassian's cross-examination took place.

By allowing the State to bring forth this improper evidence to impeach Hamilton's sole expert witness, the trial court failed in its duty as gatekeeper. Over the course of Dr. Grassian's cross-examination, these errors amassed into

---

[7] On appeal, the State asserts that Hamilton failed to specifically indicate throughout the cross-examination that he was objecting to the evidence herein on the bases that it was hearsay and that Dr. Grassian did not rely on it. Thus, the State contends, Hamilton failed to preserve these objections for appeal. We disagree.

"No error can be assigned to an evidentiary ruling where the objection at trial was insufficient to apprise the trial judge of the grounds of objection asserted on appeal." State v. Maule, 35 Wn. App. 287, 291, 667 P.2d 96 (1983) (citing State v. Wixon, 30 Wn. App. 63, 76-77, 631 P.2d 1033 (1981)). Here, defense counsel apprised the trial court of the basis for objection from the inception of the State's utilization of Hamilton's medical records in its cross-examination of Dr. Grassian. Given that the trial court later appeared to defer to the State's rationale for its mode of impeachment, it was not necessary for defense counsel to object after that point, where such repeated objections would, at best, be futile, or, at worst, draw the ire of the court or the jury.

On this record, we have no doubt that the trial court was apprised of the nature of Hamilton's objections. The trial court just simply got it wrong.

a systemic prejudice against Hamilton's case and, ultimately, deprived him of a fair trial.

A

Hamilton asserts that the trial court erroneously applied ER 703 and ER 705 so as to permit the State to impeach Dr. Grassian's testimony with the observations, opinions, and conclusions of medical professionals set forth within Hamilton's medical records. This is so, Hamilton contends, because the State never established that Dr. Grassian relied on these various record entries in formulating his expert opinions and, thus, these "unrelied on opinions" are hearsay and, accordingly, inadmissible. We agree.[8]

ER 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 802 sets forth the circumstances in which hearsay is inadmissible: "Hearsay is not admissible except as provided by these rules, by other court rules, or by statute."

In combination, ER 703 and ER 705 function as exceptions to the hearsay rule that permit disclosure on cross-examination of the facts or data upon which an expert witness relies in forming his or her opinion. ER 703 discusses the allowable bases for an expert witness's opinion.

---

[8] We review a trial court's rulings on the admissibility of evidence for an abuse of discretion. State v. Turner, 156 Wn. App. 707, 713, 235 P.3d 806 (2010) (quoting State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). An abuse of discretion exists "[w]hen a trial court's exercise of its discretion is . . . based upon untenable grounds or reasons." Turner, 156 Wn. App. at 713 (citing Powell, 126 Wn.2d at 258). "A decision is based on untenable reasons if it is based on an incorrect standard." Turner, 156 Wn. App. at 713 (citing In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)).

> The facts or data in the particular case *upon which an expert bases an opinion* or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(Emphasis added.) ER 705 sets forth the circumstances in which an expert witness on cross-examination may be required to disclose the facts or data underlying his or her opinion:

> The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination.

Hence, when an expert witness bases an opinion on facts or data, the expert may be required to disclose and discuss these facts or data on cross-examination, even if the underlying facts or data would otherwise be inadmissible as hearsay. The key, of course, is that the expert witness must have based an opinion on the facts or data, as set forth in ER 703, in order to be questioned thereon, as allowed by ER 705.

However, if the facts or data upon which the testifying expert relied are found in a hearsay report—that is, a report containing an opinion of a nontestifying expert—"the evidence of the report is not admitted as substantive proof of the report's truth; rather, the report is admitted for the limited purpose of showing the basis of the expert's opinion." EDWARD J. IMWINKELRIED, EVIDENTIARY FOUNDATIONS § 9.03[4][c], at 392 (7th ed. 2008).

Our Supreme Court, in Washington Irrigation & Development Co. v. Sherman, 106 Wn.2d 685, 686-87, 724 P.2d 997 (1986), considered the propriety of impeaching an expert witness's testimony with the contents of a nontestifying professional's report that the witness had seen but had not relied on in formulating his opinion. The court held that such impeachment was improper. Wash. Irrig., 106 Wn.2d at 688.

Adopting the view of the Fifth Circuit, our Supreme Court instructed that the party seeking to impeach an expert witness pursuant to ER 703 and ER 705 has the burden of demonstrating that the expert, in formulating his or her opinion, relied on the facts or data proffered by the impeaching party. "'Until defendant established that plaintiff had relied on the report of the other doctor, it was improper for the defendant to read from that report in cross-examining plaintiff's witness.'" Wash. Irrig., 106 Wn.2d at 689 (quoting Bobb v. Modern Prods., Inc., 648 F.2d 1051, 1056 (5th Cir. 1981)).

Because the party seeking to impeach established only that the expert witness had previously seen the proffered report, the court concluded that the party's burden to establish that the expert had actually relied on the report was not met. Having seen or read a report, the court held, did not equate to having relied upon the report. "The respondents in this case failed to establish that Sherman's expert relied upon the reports of the nontestifying doctors, although Dr. Bridgeford did admit that he had seen them." Wash. Irrig., 106 Wn.2d at 689. Accordingly, the court held that "unrelied upon opinions and conclusions should not be introduced in cross examination." Wash. Irrig., 106 Wn.2d at 689-90.

This holding is both controlling and in accordance with the weight of authority. "Cross-examination that attempts to impeach by slipping in unrelied on opinions and conclusions without calling the experts to testify is improper." ARONSON & HOWARD, supra, § 8.03[8][b], at 8-67; accord Bryan v. John Bean Div. of FMC Corp. 566 F.2d 541, 545-46 (5th Cir. 1978) ("Plaintiff's counsel, although understandably eager to bring to the jury's attention the two reports that contradicted [the defense expert], could have done so without resorting to hearsay and thereby shielding [the nontestifying experts] from cross-examination. These experts could have been called by [plaintiff's] attorney to contradict and thus impeach [the defense expert's] testimony and additionally to bring the substance of the reports to the jury." (footnote omitted)); Brandt v. Uniroyal, Inc., 425 A.2d 162, 165 (D.C. 1980) (holding that the use of a nontestifying expert's report upon which the testifying expert witness did not rely "constituted impermissible hearsay. The report was not used to determine the basis of [the testifying expert's] opinion; the sole purpose for continuing to read from the [nontestifying expert's] report was to offer it to the jury for the truth of the matter asserted therein." (footnote omitted)); James v. Ruiz, 440 N.J. Super. 45, 51, 111 A.3d 123 (App. Div. 2015) (holding that an "attorney may not pose such consistency/inconsistency questions to a testifying expert, where the manifest purpose of those questions is to have the jury consider for their truth the absent expert's hearsay opinions about complex and disputed matters"); Ferguson v. Cessna Aircraft Co., 132 Ariz. 47, 49, 643 P.2d 1017 (Ct. App. 1981), overruled on other grounds by State ex rel. Miller v. Tucson Assocs. Ltd. P'ship, 165 Ariz.

519, 799 P.2d 860 (Ct. App. 1990) ("While rules 703 and 705 of the Arizona Rules of Evidence permit the disclosure of otherwise hearsay evidence to illustrate the basis of the expert witness' opinion, *they do not permit the unrelied upon opinions and conclusions of others to be introduced in cross-examination for impeachment purposes.*" (emphasis added)); Commonwealth v. Fried, 382 Pa. Super. 156, 164-65, 555 A.2d 119 (1989) (findings of nontestifying autopsy expert were admissible where testifying expert had relied on such findings, but the conclusions that flowed from the nontestifying expert's findings were inadmissible insofar as the testifying expert disagreed with those conclusions); State v. Slocumb, 336 S.C. 619, 637, 521 S.E.2d 507 (Ct. App. 1999) ("By using [the nontestifying expert's] report, the State admitted substantive hearsay evidence of another opinion without subjecting the doctor to cross-examination."); cf. State v. White, 343 N.C. 378, 394, 471 S.E.2d 593 (1996) ("[B]ecause [the testifying expert] relied on the work of [the nontestifying expert], Rule 705 permitted the prosecutor to cross-examine [the testifying expert] about [the nontestifying expert's] conclusions, including those with which [the testifying expert] disagreed.").

Herein, Dr. Grassian opined that, due to Hamilton's bipolar mood disorder, Hamilton did not have the capacity to form the requisite mental state to commit the crime of assault. Dr. Grassian testified that he formulated his opinion from conducting interviews with Hamilton and his family members. Dr. Grassian also indicated that he had reviewed Hamilton's medical records, along with other records, in preparation for testifying.

During Dr. Grassian's cross-examination, the State attempted to impeach his testimony, identifying four medical professionals by name, explaining their expertise, and reading into the record their opinions that categorized Hamilton as having a tendency to fake mental illnesses, as psychopathic, and as not demonstrating remorse or assuming responsibility for his actions. However, during the attempted impeachment, the prosecutor did not establish that Dr. Grassian relied upon any of these nontestifying professionals' opinions, observations, or conclusions in formulating his own opinions.

During Dr. Grassian's cross-examination, the State inquired as to whether Dr. Grassian had created a list of those matters on which he had relied in formulating his opinions. Dr. Grassian testified that he had created such a list, but that he had been unable to locate it in preparing for court and that he was further unable to reconstruct the list prior to being called to testify. Although the prosecutor did ask Dr. Grassian if he had read or reviewed various portions of Hamilton's medical records, the State did not further inquire as to which records Dr. Grassian had relied on as a basis for his diagnosis or conclusions.[9]

The State's mode of impeachment was not authorized by ER 703 and ER 705. The State never established that Dr. Grassian relied on the opinions of the four nontestifying medical professionals with whose opinions he was confronted or, for that matter, any other entry in Hamilton's voluminous medical records. Although Dr. Grassian indicated that he reviewed the medical records, this

---

[9] Given Dr. Grassian's answers, the State could have attempted to impeach him as being an unreliable expert witness premised upon his poor record-keeping and admitted inability to set forth a complete basis for his opinions. It did not adopt this strategy, nor was it required to.

general statement did not establish that Dr. Grassian *relied* on the specifically identified medical professionals' observations, opinions, or conclusions in formulating his opinions. Consequently, the State improperly impeached Dr. Grassian's testimony with hearsay evidence. Had the State wished to impeach Dr. Grassian "or introduce additional medical testimony by using the reports of nontestifying physicians, they should have done so by calling these physicians as witnesses. By doing this, the use of hearsay could have been avoided and the nontestifying physicians could have been cross-examined." Wash. Irrig., 106 Wn.2d at 689.

Accordingly, the trial court erred by permitting the prosecutor to impeach Dr. Grassian with "unrelied on opinions" that constituted inadmissible hearsay.

B

At trial, the State also defended its references to entries in Hamilton's medical records by claiming that the entries fell within three other exceptions to the hearsay rule: statements made by a party opponent, statements made for the purpose of medical diagnosis or treatment, and statements contained in a business record. The State was wrong.

The State referenced and quoted statements attributed to Hamilton and set forth in his medical records. The entries that memorialized these utterances were made by people who did not testify at trial. Offered for their truth, unless the State established that an exception to the hearsay rule applied both to the statements attributed to Hamilton *and* to the written entries made by the people quoting Hamilton, the proffered evidence constituted double hearsay. Although

- 21 -

the statements attributed to Hamilton may have constituted the admissions of a

party-opponent, ER 801(d)(2), the State failed to establish an exception

applicable to the other layer of hearsay—the assertions made by the people who

generated the entries into the medical records claiming that Hamilton actually

uttered the words attributed to him. As the State concedes in its appellate

briefing:

> The defendant's statements were an admission of a party
> opponent, and therefore not hearsay. ER 801(d)(2). However[,]
> those statements were reported by non-testifying witnesses. The
> recording party's statement was hearsay. ER 801(a). It is not likely
> there was an exception to that second level of hearsay for at least
> some of those records. For that reason[,] admission of those
> statements for substantive purpose was error. ER 805.

Br. of Resp't/Cross Appellant at 76-77.

We agree.

At trial, the prosecutor additionally claimed that she could properly

introduce statements attributed to Hamilton in his medical records because these

statements were made for the purpose of medical diagnosis or treatment. See

ER 803(a)(4). However, just as the State's contention regarding admissions of a

party opponent, upon examination, melts away like butter in the sun, so does this

assertion. Here, too, an exception to the second layer of hearsay is not

identified. The records themselves were never admitted as an exhibit. At trial,

no medical professional testified that Hamilton actually made the statements

attributed to him. Thus, the statements "were reported by non-testifying

witnesses." And, as with the prior issue, "[t]he recording party's statement was

- 22 -

hearsay." See Br. of Resp't/Cross Appellant at 76-77. For this reason, it was improper for such statements to be referenced in front of the jury.

The State also asserted at trial that Hamilton's medical records constituted business records pursuant to the Uniform Business Records as Evidence Act (UBRA), RCW 5.45.020, and entries therein thus were not hearsay. Although "the UBRA is a statutory exception to hearsay rules," the act "does not create an exception for the foundational requirements of identification and authentication." State v. DeVries, 149 Wn.2d 842, 847, 72 P.3d 748 (2003) (citing 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803.42, at 23 (4th ed. 1999)). The trial prosecutor never called the witnesses necessary to identify and authenticate the various medical records. More to the point, the prosecutor never offered the records for admission. And, of course, they were never admitted. Thus, the assertion that the UBRA somehow inoculates the statements in the medical records from the effect of a hearsay objection falls flat. The claim fails.

Nevertheless, on appeal, the State asserts that Hamilton is barred from objecting to the State's reliance on the business records exception to the hearsay rules because Hamilton failed to object to the State's rationale at trial. The State is wrong.

The State never sought to admit the records. Thus, Hamilton was presented with no opportunity to object to their admission. He thus waived no claim of error.

C

The remaining justification presented by the prosecutor at trial was that, even if evidence of the "unrelied on opinions" was not offered for its truth, the State was nevertheless still entitled to impeach Dr. Grassian's testimony on the ground that Dr. Grassian *should have relied* on such opinions. Again, this is wrong.

In essence, this claim attempts to divorce a court's evaluation of the admissibility of the "unrelied on opinions" from the rules of hearsay or, alternatively, from the rules of relevancy.

As discussed above, hearsay, in pertinent part, is an out-of-court statement offered in evidence for its truth. ER 801(c). Clearly, by asserting that Dr. Grassian should have relied on the "unrelied on opinions," the State is attempting to impeach Dr. Grassian's testimony. Ostensibly, the "unrelied on opinions" possess the potential to impeach due to their truthful qualities, thus discrediting Dr. Grassian, who elected to not rely on them in formulating his own opinion. Otherwise, such "unrelied on opinions" would not serve to impeach Dr. Grassian's testimony, as an expert who refuses to rely on falsehoods remains unimpeached. Thus, proffered in this way, the "unrelied on opinions" evidence constitutes hearsay and is inadmissible. ER 801(c).

Alternatively, by asserting that Dr. Grassian should have relied on the "unrelied on opinions" regardless of their truth, the State fails to establish how that evidence of the "unrelied on opinions" is relevant. If the sole purpose behind the proffer is to impeach Dr. Grassian's testimony for failing to rely on the

"unrelied on opinions" but the opinions are not introduced for their truth, then the evidence fails "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. No expert should rely on falsehoods. Thus, proffered in this manner, the "unrelied on opinions" are irrelevant and inadmissible. ER 402.

D

Hamilton asserts that the State's improper impeachment of his sole expert witness prejudiced him, warranting a new trial. He is correct.

"[E]videntiary error will not be reversed absent a showing that the error prejudiced the defendant." Aubin v. Barton, 123 Wn. App. 592, 608, 98 P.3d 126 (2004) (citing Kramer v. J. I. Case Mfg. Co., 62 Wn. App. 544, 562, 815 P.2d 798 (1991)).

The central issue in this case was Hamilton's mental state at the time of the assaultive act. Dr. Grassian was Hamilton's only expert witness. He testified as to Hamilton's mental capacity and as to whether Hamilton could form the requisite intent to commit the charged offense. Had the jury credited Dr. Grassian's testimony, it had a duty to acquit Hamilton.

The prosecutor's mode of impeachment seriously undermined Hamilton's ability to assert his diminished capacity defense. See, e.g., Brandt, 425 A.2d at 165 ("The use of the [hearsay] report in this manner had considerable prejudicial impact upon appellants' case, for [the testifying expert witness] was the

- 25 -

appellants' sole expert witness on the critical factual question."). We are left with the firm conviction that Hamilton did not receive a fair trial.

The judgment is reversed and the cause is remanded for a new trial.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

III

Hamilton next contends that the trial court erred by denying both of his motions to dismiss. These motions were premised both on constitutional grounds and on CrR 8.3(b). The trial court erred, Hamilton asserts, because the Department of Corrections (DOC) engaged in conduct that interfered with his attempt to confer privately with his attorneys while he was incarcerated and, as a result, dismissal of the charge against him was mandated. We disagree.

A

Prior to trial, and as pertinent here, Hamilton was incarcerated at two special units within DOC correctional facilities. These special units, separated from the general prison population, are reserved for inmates who present risk of harm to other inmates, staff, or the public.

In 2012 and 2013, conduct and policies followed by DOC employees resulted in a series of interferences with Hamilton's ability to confer with his counsel, including (1) limiting Hamilton to conferring with his attorneys in a space that was neither private nor permitted the exchange of legal documents directly between Hamilton and his attorneys, (2) scanning his legal mail in greater depth

to ensure that the mail was actually legal in nature, and (3) conducting an extended search of Hamilton's prison cell in which a DOC employee read Hamilton's legal materials and left Hamilton's box of legal paperwork in disarray. In light of this conduct, Hamilton moved to dismiss the charge against him.

Upon Hamilton's motion to dismiss, the trial court conducted a lengthy, three-day hearing at which extensive testimony was taken. At the conclusion of the hearing, the trial court issued two orders, one instructing DOC to conduct a less invasive review of Hamilton's mail and the other indicating that DOC was to provide Hamilton with a more private venue to confer with his attorneys and in which he would be able to exchange legal documents with his counsel.

Thereafter, the trial court denied Hamilton's motion to dismiss, finding that DOC employees had engaged in misconduct, but concluding that no prejudice resulted to Hamilton therefrom. In light of the misconduct, however, the trial court imposed a remedy lesser than dismissal, reaffirmed its prior orders, and stated that it would reserve other sanctions related to the extended search of Hamilton's prison cell.

Shortly thereafter, Hamilton moved for reconsideration in light of the Washington State Supreme Court's then-recent decision in State v. Peña Fuentes, 179 Wn.2d 808, 318 P.3d 257 (2014). The trial court denied his motion.

Nearly half a year later, at a different correctional facility, Hamilton's ability to confer privately with his counsel was further interfered with as a result of conduct by DOC employees. This conduct included DOC employees not permitting Hamilton and his attorney to confer in private or directly exchange

legal documents, notwithstanding the trial court's previous order, and DOC employees conducting a brief, five-minute search of Hamilton's cell, in which legal documents appearing to belong to another inmate were confiscated but returned within a few hours after it was determined that Hamilton had obtained the documents properly. Hamilton again moved to dismiss the charge against him, citing both constitutional grounds and government misconduct pursuant to CrR 8.3(b).

The trial court again held a multi-day hearing. Again, extensive testimony was taken. Thereafter, the trial court denied Hamilton's motion, entering detailed findings of fact and conclusions of law. The trial court found that the DOC employees purposefully intruded into Hamilton's attorney-client relationship. However, because the trial court further found that Hamilton was serving a sentence in prison for two violent offenses; had a high security level; and had a propensity for violent outbursts, property destruction, and other harmful behaviors; it concluded that the intrusive conduct was necessary, justified, and reasonable in its scope. Further, because the State did not obtain or use confidential information to disadvantage Hamilton in the case herein, the trial court found, beyond a reasonable doubt, that the government gained no unfair advantage at trial resulting from the conduct of the DOC employees. Thus, the trial court concluded that the DOC employees' conduct neither violated Hamilton's constitutional rights nor constituted grounds for dismissal pursuant to CrR 8.3(b).

B

On appeal, Hamilton contends that, by engaging in conduct that interfered with his right to confer privately with his attorney, DOC employees deprived him of the due process guaranteed by the Fourteenth Amendment. Hamilton is wrong.

As a threshold matter, Hamilton frames his governmental misconduct contention as a denial of due process. He is mistaken. As acknowledged by Hamilton in his motion for reconsideration, the Washington Supreme Court has explicitly recognized that a criminal defendant's right to privately confer with his attorney implicates the Sixth Amendment's guaranty of effective assistance of counsel, not the Fourteenth Amendment's due process guaranty. Peña Fuentes, 179 Wn.2d at 811.

Under the Sixth Amendment's guaranty, when the State interferes with a defendant's right to confer privately with his or her attorney, prejudice to the defendant is presumed. Peña Fuentes, 179 Wn.2d at 818-19. This presumption may be rebutted when the State can show beyond a reasonable doubt that the defendant was not, in fact, prejudiced by the interference. Peña Fuentes, 179 Wn.2d at 818-19.

The trial court herein properly found, beyond a reasonable doubt, that Hamilton was not prejudiced by the DOC employees' inference with his ability to confer privately with his attorneys. Given that the DOC employees were not involved in the prosecution of the charge levied against Hamilton, were not witnesses in the case, and did not have a significant relationship with the

- 29 -

prosecution team, the trial court found, beyond a reasonable doubt, that the State did not obtain or use confidential, privileged, or strategic information to Hamilton's disadvantage. Accordingly, the trial court properly concluded that Hamilton was not deprived a right conferred to him by the Sixth Amendment.

C

Hamilton next contends that the trial court erred by denying both of his motions to dismiss, premised upon CrR 8.3(b).[10] We disagree.

We review a trial court's decision on a CrR 8.3(b) motion to dismiss for a manifest abuse of discretion. State v. Martinez, 121 Wn. App. 21, 30, 86 P.3d 1210 (2004).

In response to Hamilton's first CrR 8.3(b) motion to dismiss, the trial court imposed a lesser remedy than dismissal, entering two orders addressing the DOC's mail scanning policy and requiring a more confidential and appropriate venue in which Hamilton could meet with his attorneys. The imposition of these orders, in lieu of dismissal, was entirely within the trial court's discretion. State v. Beliz, 104 Wn. App. 206, 211-12, 15 P.3d 683 (2011) (within the trial court's discretion to order a lesser sanction than dismissal).

In response to Hamilton's second CrR 8.3(b) motion to dismiss, the trial court determined that the conduct that interfered with Hamilton's ability to confer

---

[10] CrR 8.3(b) provides:
The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial. The court shall set forth its reasons in a written order.

with his attorneys was justified in light of the correctional facility's legitimate security concerns. It was undisputed that Hamilton had recently assaulted a corrections officer. Hamilton had been placed in a special correctional unit reserved for more dangerous inmates and separated from the general prison population. The trial court's determination that the circumstances found to exist did not warrant dismissal was a ruling reserved to the trial court's discretion. Martinez, 121 Wn. App. at 30. The reasoning for the trial court's rulings was tenable. There was no error.

## IV

Given our resolution of the foregoing issues, the remaining issues raised by Hamilton's counsel need not be addressed. Similarly, the issues raised in Hamilton's statement of additional grounds are either patently without merit, are merely variations of claims already addressed, or need not be addressed because the cause is being remanded for a new trial.

Reversed and remanded for a new trial.

We concur:

- 31 -