# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of ) No. 75974-4-I
)
C.S., ) DIVISION ONE
)
Appellant. ) UNPUBLISHED
)
) FILED: January 16, 2018
)
)
)

Cox, J. — C.S. appeals the order committing him for 14 days of involuntary treatment. The trial court did not abuse its discretion in allowing witnesses to testify regarding the contents of portions of the medical records that were not admitted into evidence. This evidence falls under the business records exception to hearsay, pursuant to RCW 5.45.020. We affirm.

On September 16, 2016, a Designated Mental Health Professional filed a petition to place C.S. on a 72-hour involuntary treatment hold after he was brought to Highline Medical Center. The next day, C.S. was transferred to

Fairfax Hospital, which sought an additional 14 days of involuntary treatment. The court held a two-day commitment hearing on September 21 and 22, 2016.[1]

After considering the evidence, the trial court determined that C.S. suffered from a mental disorder, specifically Bipolar Disorder, Type I, and as a result presented as a substantial risk of harm to himself, harm to others, and as gravely disabled.[2] It entered an order committing C.S. to Fairfax for a 14-day period.

C.S. appeals.

## BUSINESS RECORDS EXCEPTION TO HEARSAY

C.S. argues that the trial court abused its discretion in permitting witnesses to testify regarding the contents of his medical records where those records were not admitted into evidence. We disagree.

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'"[3] In general, hearsay is not admissible.[4] RCW 5.45.020 provides an exception for records kept in the ordinary course of business.[5]

This statute provides:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the

---

[1] See RCW 71.05.240.
[2] See id.
[3] State v. Iverson, 126 Wn. App. 329, 336, 108 P.3d 799 (2005) (quoting ER 801(c)).
[4] Id.
[5] See also ER 803(a)(6).

2

act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.[6]

The provisions of RCW 5.45.020 require the proponent of evidence to lay a foundation before that evidence may be admitted as a business record.[7]

We review the trial court's decision to admit business records under RCW 5.45.020 for a manifest abuse of discretion.[8]

Here, the State laid the foundation for admitting portions of C.S.'s medical chart by presenting testimony from Dr. Richard Thomas and Dr. Angel Lugo-Steidel, Ph.D. Dr. Thomas testified that he was a contract evaluator at seven different facilities including Highline. He testified that he was authorized to review and write notes in medical charts at Highline. He testified that: he was familiar with the manner in which medical records were maintained at Highline, medical records were regularly maintained in the course of business, the entries were made into the medical charts at or near the time of the events being described, and the notes in the medical charts were used by Highline to establish medical diagnosis and treatment. He further testified that the medical charts were relied upon by hospital experts to formulate their opinions.

---

[6] RCW 5.45.020.
[7] Id.; see State v. Ziegler, 114 Wn.2d 533, 538-40, 789 P.2d 79 (1990); Iverson, 126 Wn. App. at 337-38.
[8] Ziegler, 114 Wn.2d at 538; State v. Garrett, 76 Wn. App. 719, 722, 887 P.2d 488 (1995).

Based on this testimony, the trial court determined that Dr. Thomas had properly laid the foundation for admission of portions of C.S.'s Highline medical chart pursuant to RCW 5.45.020.[9]

Dr. Thomas then testified to notes in C.S.'s medical chart that described C.S.'s actions and statements. The notes documented that, while in the emergency room, C.S. was hostile, demanding to staff, and manic. C.S. admitted being manic but denied needing further treatment. The next day, C.S. presented as extremely agitated, refused to return to his room, postured with his fists clenched, and said he would "show karate" if not given underwear. The trial court did not allow Dr. Thomas to testify about the statements made by the ambulance driver or by C.S.'s wife even though those statements were contained in C.S.'s medical chart.

Dr. Angel Lugo-Steidel also testified to lay the foundation to admit entries from C.S.'s medical record at Fairfax. Dr. Lugo-Steidel testified that he is a licensed clinical psychologist and employed by Fairfax where he is a court evaluator.

He testified that he was familiar with C.S.'s medical chart, and he was authorized to write in that chart and to review the notes contained therein. He testified that he was familiar with the manner in which the medical chart was maintained, that it was regularly maintained by the hospital in the course of its business, and that entries in the chart were made at or near the time of the event

---

[9] See Iverson, 126 Wn. App. at 338-39; Garrett, 76 Wn. App. at 725.

being described. He further testified that the chart notes were used by Fairfax to establish the medical diagnosis of patients, and that the charts were relied upon by hospital experts to formulate their opinions. The trial court determined that Dr. Lugo-Steidel laid the foundation for admission of C.S.'s Fairfax medical records under the business records exception to the hearsay rule.[10]

Dr. Lugo-Steidel read entries from C.S.'s Fairfax medical chart into the record. Those entries stated that C.S. had claimed he was from the planet "Alamd," and he was delusional, manic and very psychotic. He attempted to avoid taking his medications by placing them inside his cheek instead of swallowing. He was guarded, fidgety, hyperactive, restless, illogical, uncooperative, and paranoid. He had poor eye contact, repeatedly asked for discharge, threw trash, flipped tables and banged on the floor. C.S. threatened staff and had to be given emergency medication.

Dr. Lugo-Steidel testified that in evaluating C.S., he relied on his interview with C.S., the medical charts from Highline and Fairfax, and the testimony of Deputy Graeme Glasgow, the police officer who had referred C.S. for an involuntary treatment hold. Dr. Lugo-Steidel stated that C.S. held a diagnosis of Bipolar I Disorder, with manic, severe or psychotic, and opined that C.S. presented a substantial risk of physical harm to himself, to others, and that he presented as gravely disabled.

---

[10] See Garrett, 76 Wn. App. at 725.

C.S. argues that the trial court erred in admitting the testimony of Dr. Lugo-Steidel and Dr. Thomas regarding material contained in his medical records because the medical records themselves were not admitted into evidence. He does not contest the relevancy of the evidence, only whether it was otherwise admissible.

Once Dr. Thomas and Dr. Lugo-Steidel laid the proper foundation for admission of C.S.'s medical records, they could testify regarding statements and acts attributed to C.S. even though the witnesses who entered that information into his medical chart did not testify.[11]

C.S. relies on this court's decision in State v. Hamilton as support for his argument that the trial court erred in allowing testimony about the content of his medical chart because the State never offered the medical records as an exhibit.[12] Such reliance is misplaced.

In Hamilton, Jimi Hamilton introduced expert opinion testimony from Dr. Stuart Grassian in support of his diminished capacity defense to a charge of second degree assault.[13] Dr. Grassian testified that Hamilton was not able to form the requisite intent to commit assault.[14] Dr. Grassian based his opinion on his interviews with Hamilton and others.[15] Although he reviewed Hamilton's voluminous medical records, Dr. Grassian testified that he did not rely on them

---

[11] See Iverson, 126 Wn. App. at 338-39; Garrett, 76 Wn. App. at 725.
[12] 196 Wn. App. 461, 383 P.3d 1062 (2016), review denied, 187 Wn.2d 1026 (2017).
[13] Id. at 464-65.
[14] Id. at 467.
[15] Id. at 466.

when forming his opinion.[16] The State then sought to impeach Dr. Grassian using Hamilton's medical records and the opinions of four other medical doctors contained therein.[17]

This court held that the State could not impeach Dr. Grassian using records and opinions that he never claimed to have relied upon in formulating his expert opinions.[18] This court also rejected the State's argument that the opinions contained in Hamilton's medical records were admissible as business records, because RCW 5.45.020 "does not create an exception for the foundational requirements of identification and authentication."[19] Because the State "never called the witnesses necessary to identify and authenticate the various medical records" as required by RCW 5.45.020, those records, and the opinions contained therein, were inadmissible.[20]

Here, unlike in Hamilton, the State laid the proper foundation for admission of portions of C.S.'s medical records through the testimony of Dr. Thomas and Dr. Lugo-Steidel. In addition, unlike in Hamilton, here the State presented Dr. Lugo-Steidel's testimony that he actually relied on the evidence in the medical charts when formulating his opinion.

---

[16] Id. at 466-67.
[17] Id. at 468-73.
[18] Id.
[19] Id. at 483 (quoting State v. DeVries, 149 Wn.2d 842, 847, 72 P.3d 748 (2003)).
[20] Id.

7

C.S. cites no other authority as support for his contention that *all* of his medical chart must be admitted before witnesses could read entries from that chart into the record.[21] We assume there is none.

We affirm the order of commitment.

Cox, J.

WE CONCUR:

Mann, J.

Appelwick, J.

---

[21] <u>Darkenwald v. Emp't Sec. Dep't</u>, 183 Wn.2d 237, 248, 350 P.3d 647 (2015); RAP 10.3(a)(6); <u>King Aircraft Sales, Inc. v. Lane</u>, 68 Wn. App. 706, 717, 846 P.2d 550 (1993).