[No. 21477-2-I. Division One. September 25, 1989.]

THE STATE OF WASHINGTON, *Respondent*, v. ARTHUR HEGGINS, *Appellant*.

*Theresa B. Doyle* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Cynthia S.C. Gannett* and *Linda Cohen, Deputies,* for respondent.

PEKELIS, J.—Arthur Heggins appeals his conviction for second degree murder. He alleges the trial court erred in (1) admitting the testimony of the County's chief medical examiner, who signed the autopsy report, but did not actually perform the autopsy; (2) failing to suppress his custodial statements to police officers; (3) failing to instruct the jury that self–defense was a defense to second degree assault, the underlying charge on which the murder charge was based; and (4) allowing the jury to convict of second degree felony murder when the underlying crime was the same felony that caused the victim's death.

## I

On the evening of September 2, 1987, Arthur Heggins approached William Wagner, who was standing outside Yesler Terrace near some benches talking with Michelle Adams and Charles Berry. Adams saw Heggins run up, strike Wagner on the face with a gun, and shoot Wagner in the chest. After the shot, Heggins dropped the gun, then picked it up and ran. Adams further testified that Wagner was unarmed at the time, had nothing in his hand, did not make any moves toward his pockets, and did not run or jump at Heggins.

Charles Berry testified that he saw Heggins approach with a gun in his hand. Heggins said to Wagner, who evidently owed him some money, "Where is my money at?" Then Heggins hit Wagner on the side of the head with his gun, and the gun went off. The gun fired as soon as it made contact with Wagner, and Berry did not think that Heggins meant to kill Wagner. Berry saw nothing in Wagner's hands at the time Heggins struck him.

The defendant testified that Michelle Adams met him on the street and told him that someone wanted to see him down by the benches. Heggins walked down to the bench area, saw Wagner, and asked where his money was. Wagner

just stood there with a blank stare and did not say anything. Heggins got the feeling he was being set up and saw Wagner make a threatening move toward his pocket. At that point, he took his gun out to stop whatever was going on. He lifted his gun up and it slipped out of his hand. He then heard an explosion and heard his gun hit the ground. At no time did he strike Wagner. He picked up his gun, became scared, and left.

Dr. Donald Reay, Chief Medical Examiner for King County, testified as to the autopsy results. One of his assistants, Dr. Corrine Fligner, actually performed the autopsy and Reay signed the autopsy report when he reviewed it. Based on photographs of the wounds that were admitted into evidence and on the objective facts in Fligner's report, Reay gave his opinions as to the nature of the gunshot wound and the cause of the victim's death. He described the wound as a contact wound, due to the nature and distribution of gun powder residue surrounding it. He also examined the shirt that had been worn by the victim, and noted that the tear in it was consistent with his conclusion that the wound had been a contact wound. Reay also related Fligner's findings that the bullet had traveled at an angle 45 degrees downward from the sagittal plane and 20 degrees from the transverse plane, and had passed through a number of vital organs, causing Wagner's death.

On the day following the shooting, Heggins turned himself in to the Seattle Police Department. He was interviewed by Detective Eugene Ramirez, who read him his constitutional rights from a standard form, including a section stating that, "Any statement that you make either oral or written can be used as evidence against you in a court of law." After reading each section of the form, Ramirez asked Heggins whether he understood that section and Heggins said he did. Heggins also signed the form indicating that he had been advised of his rights and understood them.

Ramirez then read Heggins a portion of the form that provided for a waiver of those rights. Heggins declined to sign that portion and stated that he was not going to give

up his constitutional rights. He said that he did not want to make a written statement, but that he would be willing to talk to Ramirez about the incident. Heggins testified that it was his "understanding" that because he told Ramirez that he did not want to give up his rights that whatever he said was "off the record".

Ramirez testified that during that interview, Heggins denied the shooting and denied knowing Wagner. Heggins also made statements which proved to be false as well as statements which were inconsistent. Other than reading him the section of the form quoted above, Ramirez had no discussion with Heggins regarding the fact that his oral statements could be used against him. Somewhere near the end of the interview, however, Ramirez told Heggins that "it was basically the same, either written or oral, what he had said to us, it was basically the same because I would testify to the fact of what he said." Ramirez said Heggins then continued to talk to him and at no time said he wanted to talk "off the record."

Following the CrR 3.5 hearing, the trial court held that Heggins' statements were knowingly, intelligently and voluntarily made in compliance with *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

The State charged Heggins with second degree murder on alternative prongs of intentional murder and felony murder, the latter based on an underlying crime of assault in the second degree. Heggins' theory at trial was that he took the gun out of his pocket and cocked it in self–defense and that the gun went off accidentally. The jury found him guilty on a general verdict form of second degree murder.

## II

Heggins first contends that it was error to admit the testimony of Dr. Reay because it was inadmissible hearsay and because it denied his State and federal constitutional rights to confront Dr. Fligner, who actually performed the autopsy. The State responds that Reay's testimony was

admissible as an accompaniment to a business record under RCW 5.45.020.

■ We first examine the admissibility of the report since the person who made a report is permitted to testify as to its content if the report qualifies as an admissible business record pursuant to RCW 5.45.010. *See State v. Kreck,* 86 Wn.2d 112, 115, 542 P.2d 782 (1975); *State v. Rutherford,* 66 Wn.2d 851, 854–55, 405 P.2d 719 (1965), *appeal dismissed, cert. denied,* 384 U.S. 267, 16 L. Ed. 2d 525, 86 S. Ct. 1477 (1966). As utilized here by Reay,[1] the autopsy report satisfied the requirement that a business record must describe an "act, condition or event", rather than contain entries in the form of opinions or statements as to cause. *See Kreck,* 86 Wn.2d at 118–19; *see also State v. Monson,* 53 Wn. App. 854, 856–57, 771 P.2d 359 (referring to RCW 5.44.040, regarding the admission of public records), *review granted,* 113 Wn.2d 1001 (1989).

■ The next question is whether Reay was qualified to testify regarding the report. The testifying witness need not have conducted nor personally observed all of the tests or measurements contained in the report, so long as it was prepared under the witness' supervision. *See Kreck,* 86 Wn.2d at 115. Reay is the Chief Medical Examiner; the autopsy report was prepared under his direction and was signed by him. Thus, he is qualified to testify as to its contents, and it was not in error to allow his testimony.

■ Heggins next contends that the admission of Reay's testimony violated his confrontation rights. Under *Kreck,* where a business record "meets the requirements for admissibility of RCW 5.45.020", it is "sufficiently reliable to meet the reliability requirement" of both state and federal constitutional confrontation provisions. This is "because

---

[1]Although the actual report did contain some opinion statements, Reay referred only to objective facts from the report in the course of his testimony. The report itself was not admitted into evidence.

the circumstances under which it was prepared demonstrate its trustworthiness". *Kreck,* 86 Wn.2d at 121.[2]

Following *Kreck,* we conclude that since Reay's testimony relating to the autopsy report was properly admitted, no confrontation clause violation occurred. *See Kreck.* Moreover, any confrontation problems were clearly obviated here where Reay's opinions were based on evidence other than Fligner's observations. Reay particularly relied on photographs admitted into evidence which showed the wound in detail, including the deposits of soot around it. He also considered the nature of the tears in the victim's shirt in reaching his conclusions. Thus, Heggins had as great an opportunity to confront and challenge Reay on the issue of his opinion and experience regarding such evidence as he would have had to confront and challenge Fligner.[3]

## III

Heggins next asserts that Officer Ramirez should have ceased questioning him when he stated he understood his *Miranda* rights but declined to sign the waiver form. The State responds that there was no need to cease questioning since Heggins indicated he was willing to talk to Ramirez.

---

[2]Heggins also asserts that the State was required to show that Fligner was unavailable. We recognize that *Kreck* predates the seminal case of *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), which held that the confrontation clause "normally requires a showing that [a hearsay declarant] is unavailable." *Roberts,* 448 U.S. at 66. However, a recent Supreme Court case has limited *Roberts* to the propriety of admitting prior hearing testimony, and held that a showing of unavailability is *not* a prerequisite to the admission of evidence pursuant to all hearsay rule exceptions. *United States v. Inadi,* 475 U.S. 387, 89 L. Ed. 2d 390, 106 S. Ct. 1121, 1126 (1986) (unavailability need not be shown prior to admission of coconspirator's statements). The Washington Supreme Court has reserved judgment on whether a showing of unavailability is required in all cases before hearsay can be admitted in a criminal trial. *State v. Hieb,* 107 Wn.2d 97, 108, 727 P.2d 239 (1986). Thus, there is no authority for Heggins' contention.

[3]We also note that Heggin's theory at trial, that the wound occurred when the gun accidentally impacted the victim's chest, was not inconsistent with Reay's testimony that the wound was a contact wound.

■ When an individual under arrest indicates during questioning that he wishes to remain silent, the interrogation must cease, *Miranda v. Arizona*, 384 U.S. 436, 473–74, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 485, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981). Additionally, a waiver of the right to remain silent may be found when the defendant freely responds to police questioning after initially asserting *Miranda* rights. *State v. Wheeler*, 108 Wn.2d 230, 238, 737 P.2d 1005 (1987). The State must show a waiver by a preponderance of the evidence. *State v. Robtoy*, 98 Wn.2d 30, 35–36, 653 P.2d 284 (1982).

Nearly on all fours is the case of *Connecticut v. Barrett*, 479 U.S. 523, 93 L. Ed. 2d 920, 107 S. Ct. 828 (1987). In that case, the defendant was advised of his rights, and signed and dated an acknowledgment that he had received the warnings required by *Miranda*. Barrett then stated that he would not give the police any written statements until his attorney arrived, but would talk to them about the incident. He proceeded to give an oral statement. *Barrett*, at 525. The Supreme Court held that Barrett's limited request for counsel accompanied by affirmative announcements of his willingness to speak with the authorities did not require suppression of his oral statements. "*Miranda* gives the defendant a right to choose between speech and silence, and Barrett chose to speak." *Barrett*, at 529.

The Court also rejected Barrett's contention that the distinction he drew between oral and written statements indicated such an incomplete understanding of the consequences of his speech that the Court should deem his limited invocation of his constitutional rights effective for all purposes. The Court noted that this contention ignored Barrett's own testimony that he had fully understood the *Miranda* warnings. The Court stated that it had never "'embraced the theory that a defendant's ignorance of the

full consequences of his decisions vitiates their voluntariness.'" *Barrett,* at 530 (quoting *Oregon v. Elstad,* 470 U.S. 298, 316, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985)).

Similarly, in this case Heggins affirmatively announced his willingness to speak with the officers, and testified that he fully understood the *Miranda* warnings. The fact that he may have been mistaken about the consequences of his decision to speak to Ramirez does not affect the voluntariness of his choice to do so. Thus, the trial court properly admitted his custodial statements.

## IV

Heggins' next contention is that the jury instructions were inadequate in that they failed to advise the jury that the State must disprove his claim of self–defense with regard to the second degree assault element of the felony murder charge. The State responds that the instructions allowed Heggins to argue his theory of the case to the jury and that a self–defense instruction with regard to the assault was unnecessary since he was not charged with a separate count of assault.

The trial court instructed the jury on the two charged alternative methods of committing second degree murder, intentional murder and felony murder based on an underlying second degree assault. Assault was defined for the jury. Additionally, the jury was instructed on two defenses to the charge of murder: (1) excuse due to accident, and (2) self–defense. No instruction informed the jury that accident or self–defense were defenses to second degree assault.

Since this error was not raised at trial, the initial inquiry is whether the issue presents a manifest error affecting a constitutional right, such that it may be raised for the first time on appeal. *See State v. Scott,* 110 Wn.2d 682, 757 P.2d 492 (1988). Assuming that Heggins' argument is correct that the absence of self–defense is an element of a felony murder charge based on assault, it would be a manifest constitutional error to fail to inform the jury that the State bore the burden of disproving self–defense. This is because

the due process clause of the Fourteenth Amendment requires the State to prove beyond a reasonable doubt all elements of the crime charged. *In re Winship*, 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). However, the following analysis demonstrates that the jury was properly instructed.

■ The standard an appellate court follows in reviewing self–defense instructions is whether the jury could understand from the instructions as a whole that the State bears the burden of proving the absence of self–defense. *State v. Acosta*, 101 Wn.2d 612, 622, 683 P.2d 1069 (1984). Here, the self–defense instruction states that it applies "to a charge of murder". Thus, it is clear that the instruction was intended to apply to both intentional murder and to the felony murder alternative.[4] The jury was instructed that in order to convict of felony murder, the State must prove as one element of the crime "[t]hat the defendant was attempting to commit assault in the second degree." When reading the instructions as a whole, therefore, the jury would have understood that the State had the burden of proving the absence of self–defense with regard to each element of the murder charge, including the attempt to commit second degree assault element. It would have been surplusage to add another self–defense instruction pertaining specifically to second degree assault. As the State points out, Heggins was not charged with a separate count of assault. Thus, the trial court did not err in failing to instruct as Heggins suggests.[5]

---

[4]Though the State has not raised the issue, it is questionable whether self–defense is available in second degree felony murder prosecutions since intent is not an element of that offense. *See State v. Dennison*, 54 Wn. App. 577, 582, 774 P.2d 1237 (1989) (holding that self–defense is unavailable as a matter of law in a first degree felony murder prosecution based on a burglary).

[5]Heggins' brief alludes to a separate instructional error, the failure to give a unanimity instruction with regard to the two alternative prongs of the second degree murder charge. The error was not properly raised in the assignments of error, however, so we do not consider it here. *See* RAP 10.3(a)(3).

## V

 Finally, Heggins asserts, despite settled law in this state, that the doctrine of merger should be applied to the crime of second degree felony murder. He argues that the assault resulting in the homicide should be merged with the homicide so that a death resulting from a felonious assault cannot be felony murder. As the State correctly points out, our Supreme Court has refused a number of times to apply merger doctrine to the crime of felony murder. *State v. Wanrow,* 91 Wn.2d 301, 588 P.2d 1320 (1978); *State v. Thompson,* 88 Wn.2d 13, 558 P.2d 202, *appeal dismissed,* 434 U.S. 898, 54 L. Ed. 2d 185, 98 S. Ct. 290 (1977); *State v. Harris,* 69 Wn.2d 928, 421 P.2d 662 (1966).[6] Thus, we find no error in the trial court's rejection of Heggins' arguments relating to merger.

Affirmed.

COLEMAN, C.J., and GROSSE, J., concur.

Review by Supreme Court pending April 30, 1990.

---

[6]We do not believe that two recent United States Supreme Court cases cited by Heggins require, as he claims, reconsideration of *Wanrow.* These cases involve principles related to disproportionate sentences impermissible under the Eighth Amendment. *Solem v. Helm,* 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983); *Enmund v. Florida,* 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982). Neither case involves merger principles and the cases are inapposite to the issues and rationale of *Wanrow.*