[No. 32865-4-I.    Division One.    January 23, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. GERALD LAWRENCE GARRETT, *Appellant*.

*Lenell Rae Nussbaum*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *James Morrissey Whisman, Deputy*, for respondent.

AGID, J. — Gerald Lawrence Garrett appeals his conviction of one count of first degree rape of a child. He contends that the trial court improperly allowed a physician to testify to the contents of medical reports admitted under the business records exception to the hearsay rule, improperly admitted certain physical evidence without adequate foundation, and erroneously permitted several witnesses to relate the victim's prior out-of-court statements.[1] We affirm.

## FACTS

In August 1992, Garrett had been involved in a romantic relationship with Serina, the victim's mother, for several years. On August 16, Garrett spent the evening watching television with Serina. They later had sexual intercourse in Serina's bed. Shortly afterward, Serina's children, Little Gerald[2] and "D", got into bed with them. They later went into the living room where Garrett slept on the couch and Serina on the floor.

Serina testified that the next morning, D, then $3^1/2$, woke Serina, saying, "mommy, mommy, mommy, Big Gerald . . .

---

[1]Garrett's pro se brief raises no additional issues.

[2]According to Serina, Garrett is her son's father. His nickname is "Little Gerald". Garrett has no biological relationship to D.

put his wee-wee down here" pointing to her private area, and said "I got an 'owie' down there." Serina pulled down D's underwear and saw a small cut with blood in her vaginal area. Serina took D to Harborview hospital's emergency room that morning.

At the hospital, D and her mother were first interviewed by a medical social worker and then a pediatric resident, Dr. Susan Omura. Dr. Naomi Sugar, a physician at Harborview's Sexual Assault Clinic (SAC), testified at trial regarding the results of Dr. Omura's medical examination of D.[3] Using a colposcope, Dr. Omura took photographs of D's injuries; the medical examination and photographs revealed a laceration and bruising in D's vaginal area. In Dr. Sugar's opinion, the laceration was 12 to 24 hours old.

On a swab taken from D's groin area, Dr. Omura performed a Woods Lamp test, used to determine whether semen is present. Dr. Sugar testified that certain chemicals in semen fluoresce under ultraviolet light, and that there was positive fluorescence in D's left inguinal, or groin, area. Dr. Omura also took several swabs from D's inner thigh and vaginal areas to be tested in the medical and forensic labs. Dr. Sugar drew a diagram of the female genitalia, to which she referred in explaining to the jury the location of the laceration and bruising. In Dr. Sugar's opinion, D's injuries were consistent with her claim that she had been sexually assaulted.

### Admissibility of Expert Medical Testimony

Garrett first contends that the trial court erred in admitting D's medical records and Dr. Sugar's testimony under the business records exception to the hearsay rule, RCW 5.45.020. He argues that Dr. Sugar was not qualified to testify because she did not supervise the emergency room physicians and social worker who made the records. We disagree.

██ The Uniform Business Records as Evidence Act provides:

---

[3]Dr. Sugar was called to testify because she was D's treating physician for a followup examination in November 1992.

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

RCW 5.45.020. The trial court's decision to admit business records is reviewed only for a manifest abuse of discretion. *State v. Ziegler*, 114 Wn.2d 533, 538, 789 P.2d 79 (1990); *State v. Alexander*, 64 Wn. App. 147, 156, 822 P.2d 1250 (1992).

In *Ziegler*, the child victim's treating physician, Dr. Bishop, was unavailable to testify, so his partner, Dr. Gerrish, testified from the common medical file. Dr. Gerrish testified that Dr. Bishop had diagnosed the child as having vaginitis and taken a vaginal smear which he sent to a laboratory for analysis and which tested positive for Chlamydia. Several months later, Dr. Bishop took a second smear, which tested negative for Chlamydia. The defendant objected to the admissibility of the lab's test results under the business records exception, arguing that the proper foundation had not been laid because a records custodian from the laboratory did not testify to their contents.

Rejecting this contention, the *Ziegler* court stated that " '[a] practicing physician's records, made in the regular course of business, properly identified and otherwise relevant, constitute competent evidence of a condition therein recorded.' " 114 Wn.2d at 538-39 (quoting *State v. Sellers*, 39 Wn. App. 799, 806, 695 P.2d 1014, *review denied*, 103 Wn.2d 1036 (1985)). The court upheld the trial court's admission of the reports as business records because Dr. Bishop ordered the tests, the clinic relied on the lab's test results in treating patients, the record was in the clinic's custody as part of the child's medical file, and Dr. Gerrish testified that he was familiar with the laboratory and its testing procedures. *Ziegler*, 114 Wn.2d at 539-40.

The medical record prepared during Dr. Omura's examination of D possesses the same indicia of reliability. The record became part of D's common medical file at the SAC.

Through her trial testimony, Dr. Sugar demonstrated her familiarity with the examination and testing procedures used by Dr. Omura in treating D. In addition, Dr. Sugar testified that she routinely relies on such emergency room medical reports in treating her patients at the SAC. Dr. Sugar also testified that either a social worker or a physician routinely interviews suspected sexual assault victims before the physical examination, and that was done in this case. This report was also made part of the common medical file.[4]

Garrett relies on *Alexander* and *State v. Heggins*, 55 Wn. App. 591, 779 P.2d 285 (1989), to argue that the records were inadmissible because Dr. Sugar did not supervise their preparation. The cases do not support his argument. In *Heggins*, the court ruled that the witness was qualified to testify regarding an autopsy report because the autopsy was prepared under his supervision. The court stated that "[t]he testifying witness need not have conducted nor personally observed all of the tests or measurements contained in the report, so long as it was prepared under the witness' supervision." *Heggins*, 55 Wn. App. at 596. Following *Heggins*, this court ruled in *Alexander* that a supervising physician was qualified to testify to a medical report prepared by another physician under her direction. *Alexander*, 64 Wn. App. at 156-57.

As authority for the rule that the record must be made under the witness' supervision, the *Heggins* court cited *State*

---

[4]Garrett argues that the social worker's report was not reliable evidence because Dr. Sugar did not know the social worker. Had Dr. Sugar been personally acquainted with the social worker, however, this would not have made her report any more reliable. What makes the report reliable is that Dr. Sugar routinely relies on such reports in making treatment decisions, the report was signed by its recorder and dated, showing it was made at or near the time of the emergency room visit, and it was made part of D's medical file.

Dr. Sugar read quotes from the social worker's report of her interview with D and her mother, including D's statement that "Big Gerald touched me here (pointing to crotch) with his wee-wee." Garrett apparently does not contend that D's statement should have been excluded as hearsay. Such a contention would fail in any event. *In re J.K.*, 49 Wn. App. 670, 745 P.2d 1304 (1987) (holding that the victim's statements to a medical social worker during an interview in a hospital emergency room were statements made for purposes of medical diagnosis or treatment, admissible under ER 803(a)(4)), *review denied*, 110 Wn.2d 1009 (1988).

*v. Kreck*, 86 Wn.2d 112, 542 P.2d 782 (1975). However, *Kreck* does not impose such a requirement under the business records rule. There, our Supreme Court ruled that the state toxicologist, Dr. Loomis, was qualified to testify regarding the results of a blood test where the report was prepared under the witness' supervision. The court concluded that the testimony was admissible because the record met five requirements, all designed to ensure that the evidence was reliable: (1) the evidence was in the form of a record; (2) the record was of an act, condition or event; (3) the record was made in the regular course of business; (4) it was made at or near the time of the act, condition or event; and (5) the court was satisfied that " 'the sources of information, method and time of preparation were such as to justify its admission.' " *Kreck*, 86 Wn.2d at 119 (quoting RCW 5.45.020). According to the court, requirements (3), (4), and (5) were satisfied because Dr. Loomis testified that the lab tests were made in the regular course of business, the testing procedures ensured accuracy, the results were properly dated and documented, and the report was signed by the chemist who conducted the tests. *Kreck*, 86 Wn.2d at 118-19. Although the court noted that the report was prepared under Dr. Loomis' supervision, it did not hold that this is an absolute requirement of the statute. *See Kreck*, 86 Wn.2d at 114-15.

■ *Heggins, Alexander*, and *Kreck* certainly support the proposition that a person who supervised the making of a record is qualified to testify to its contents. However, they do not support the converse rule. The party seeking admission of the record is not precluded from presenting other testimony to demonstrate the witness' familiarity with the procedures used. As the court in *Ziegler* stated:

> As applied to hospital records, compliance with the act obviates the necessity, expense, inconvenience, and sometimes impossibility of calling as witnesses the attendants, nurses, physicians, X ray technicians, laboratory and other hospital employees who collaborated to make the hospital record of the patient. It is not necessary to examine the person who actually created the record so long as it is produced by one who has the custody of the record as a regular part of his work *or* has supervision of its creation.

(Italics ours.) *Ziegler*, 114 Wn.2d at 538 (quoting *Cantrill v.*

*American Mail Line, Ltd.*, 42 Wn.2d 590, 608, 257 P.2d 179 (1953)).

As D's treating physician, Dr. Sugar had custody of D's common medical file, which included the record of her emergency room visit. The reports were signed and dated by Dr. Omura, Dr. Mary Gibbons and the social worker, demonstrating that the record was made on the date D went to the emergency room. According to Dr. Sugar, emergency room patients are often referred to SAC. Under these circumstances, it is unrealistic to expect that a treating physician at the clinic such as Dr. Sugar would be in the position to supervise emergency room pediatric residents like Dr. Omura. As in *Ziegler*, Dr. Sugar based her testimony on records prepared by her fellow physicians in the ordinary course of business, records on which she routinely relies in treating patients at SAC. As with all other hearsay exceptions, the purpose of RCW 5.45.020 is to assure that evidence is reliable, *Kreck*, 86 Wn.2d at 118, and the trial court is accorded considerable deference in making this determination. *Ziegler*, 114 Wn.2d at 538. We hold that the statute does not require the witness to have personally supervised the sometimes numerous individuals who have contributed to the patient's medical file. The trial court properly admitted D's medical records and Dr. Sugar's testimony into evidence.[5]

Garrett also claims that the trial court erred in allowing Dr. Sugar to give Dr. Omura's medical opinion of whether D had been raped. He argues that this opinion testimony was admitted in violation of RCW 5.45.020 and his constitutional right of confrontation. *See State v. Wicker*, 66 Wn. App. 409, 413, 832 P.2d 127 (1992) (under the business records exception, an expert witness may testify only to acts, conditions or events, not to entries in the form of opinions or causal state-

---

[5]Garrett also relies on *State v. Wicker*, 66 Wn. App. 409, 413, 832 P.2d 127 (1992), holding that a lab technician could not state his fellow technician's opinion as to whether the fingerprints obtained from the crime scene matched the defendant's. Contrary to Garrett's interpretation, *Wicker* stands for the proposition that a witness may not give another expert's *opinion* contained in a business record; however, it does not preclude the witness from testifying about *facts* recorded by other professionals.

ments). However, the record indicates that Dr. Sugar was actually asked whether, in *her* opinion, based on D's medical record, D's injuries were consistent with the history D had related. As demonstrated above, this testimony was properly admitted. In addition, the entry in the medical record, which read "DX: 1. History of sexual assault", was not necessarily Dr. Omura's *opinion* of what had happened to D. The jury could also have interpreted the entry as Dr. Omura's report of what the victim told her during the medical examination.[6] As a statement made for purposes of medical diagnosis or treatment, the entry was admissible under ER 803(a)(4).

The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. *See* RCW 2.06.040; CAR 14.

BAKER, A.C.J., and BECKER, J., concur.

---

[6]The trial court ruled that the entry referred to *D's* account of what had happened to her, not the physician's opinion, and invited the Defendant to examine Dr. Sugar on that point and clarify the entry's meaning if necessary. The defense apparently chose not to clarify the point.