IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

STATE OF WASHINGTON,          )
                              )     No. 32927-5-III
            Respondent,       )
                              )
    v.                        )
                              )     UNPUBLISHED OPINION
TRAVIS LEE PADGETT,           )
                              )
            Appellant.        )

SIDDOWAY, J. — Travis Padgett was given an exceptional aggravated sentence of 360 months of confinement after a jury found him guilty of 11 sexual crimes committed against 3 young teenagers, including his own 14-year-old son, and of delivery of methamphetamine to 2 of the teens. He makes 19 assignments of error in his brief and in a pro se statement of additional grounds.

The evidence that Mr. Padgett delivered methamphetamine to his son is insufficient, so we reverse that conviction. We also remand for the trial court to address two clerical errors and one oversight committed at sentencing. We otherwise affirm.

FACTS AND PROCEDURAL BACKGROUND

The underlying facts are known to the parties and disturbing details are irrelevant to this appeal. In January 2013, 6 months after Travis Padgett was awarded custody of

his then 14-year-old son, Henry M.,[1] Henry contacted his mother to say that Mr. Padgett was using drugs and he wanted to run away. Henry's mother contacted Yakima police, and a patrol officer put Henry in touch with his school resource officer. Given the seriousness of what Henry reported to the resource officer about not only drug use, but sexual abuse, she promptly took Henry to speak with Curtis Oja, a detective with the department's special assault unit.

In an hour-long interview, Henry told Detective Oja about his father's drug use and about Henry's sexual contact with his father and his father's female guests. Based on Henry's disclosures, the detective obtained a search warrant for Mr. Padgett's home that officers executed that evening.

In the course of the search, police officers found sex toys and devices in an ottoman and utility room, along with a wadded up shower curtain. Attached to the four bedposts of Mr. Padgett's bed were industrial hooks, later testified to being used for bondage. Officers found no evidence of drugs or drug use.

Officers executing the search warrant also encountered a 14-year-old girl, Candace S., in the home. Candace had met Mr. Padgett through her friend, who Candace said was Mr. Padgett's methamphetamine dealer. Candace had been at Mr. Padgett's home for

---

[1] "Henry M.," "Jack J.," and "Candace S." are pseudonyms for the juvenile victims of Mr. Padgett's crimes. *See* General Order of Division III, *In re Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App.), http://www.courts.wa.gov/appellate_trial_courts/.

2

two days, had engaged in oral sex during that time with Mr. Padgett and an adult female friend, and had ingested methamphetamine provided by Mr. Padgett within a half hour before the search warrant was executed. She agreed to travel to the police department to be interviewed by Detective Michael Durbin, and based on their interview, the detective had another officer transport her to the hospital for a sexual assault examination.

Several days after the search, Detective Oja was contacted by a family member of Jack. J, a friend of Henry's. The family member learned of Mr. Padgett's arrest and—knowing Jack spent time at the Padgett home—was concerned he might have been sexually assaulted. Detective Oja interviewed Jack on January 22, 2013.

The State filed initial charges against Mr. Padgett the next day. Trial was delayed by the granting of four continuances, all made or joined in by defense counsel, but over Mr. Padgett's personal objections.

A little over 2 months before a continued trial date of October 7, 2013, the State amended its information to include the following 14 charges, involving the following victims:

| Crimes against Henry: | Three counts of third degree rape of a child (counts 1, 3, and 5); |
| | Three counts of first degree incest (counts 2, 4, and 6); and |
| | One count of distributing a controlled substance to a minor (count 8). |

3

|                        |                                                                              |
| ---------------------- | ---------------------------------------------------------------------------- |
| Crimes against Candace: | One count of communicating with a minor for immoral purposes (count 7); and |
|                        | One count of distributing a controlled substance to a minor (count 9). |
| Crimes against Jack:   | Three counts of third degree child molestation (counts 10, 12, and 14); |
|                        | Two counts of third degree rape (counts 11 and 13). |

Clerk's Papers (CP) at 14-19.

Three days before trial was finally set to begin, Mr. Padgett's defense lawyer moved for a further continuance based in part on receiving, only a week before, results of court-ordered testing of a DNA[2] sample from Mr. Padgett and the shower curtain collected in the search of Mr. Padgett's home. The testing had been requested and ordered in August. The trial court denied a further continuance.

During trial, both Henry and Jack testified to multiple sexual encounters they had with Mr. Padgett. Henry testified to many more incidents than the number of counts charged, telling the jury that his father had sex with him "pretty much every day." Report of Proceedings (RP)[3] at 763.

Henry also testified to using methamphetamine provided by his father. He

---

[2] Deoxyribonucleic acid.

[3] Except as otherwise indicated, citations to the report of proceedings and "RP" are to the consecutively-numbered 10 volumes of proceedings that begin with pretrial motions on October 7, 2013, and conclude with the sentencing hearing on November 21, 2014.

testified that Mr. Padgett first gave it to him in a cup, telling him to lick the bottom of the cup, which was the meth, and that it "tasted really gross." RP at 780-82. Henry described feeling "full of energy" after licking the rocks, and testified that he stayed up until 9:00 a.m., engaging in sexual contact with his father. RP at 783. He told jurors that on later occasions, he smoked methamphetamine with his father, using what he described as "a tube sticking out of a ball," but "it didn't really feel like you were smoking anything." RP at 806.

The State offered expert testimony on DNA testing of three dildos collected during the search of Mr. Padgett's home, each of which contained DNA that was a match for Mr. Padgett. One was a potential match for Henry.

Trial evidence of the crimes committed against Candace included her testimony and that of Dr. Wyatt Rivas, the emergency room physician who treated her when she was brought to the hospital by police officers. He testified that she reported a history of drug use including methamphetamine, marijuana, mushrooms, and cocaine. Over a defense objection, he testified that he ordered a drug screen of a urine sample that tested positive for methamphetamine. The technician who conducted the urine sample did not testify.

To the extent the 14 counts involved a charge of the same crime against the same victim (*e.g.*, the instructions on counts 1, 3, and 5, charging the third degree rape of Henry) the to-convict instructions given the jury were, for the most part, identical. In

5

closing argument, the prosecutor identified for jurors the conduct being alleged as the basis for each count.

The jury returned guilty verdicts on all counts except count 14. On counts 1 through 6 (rape and incest involving Henry), the jury returned special verdicts finding that each crime (1) was part of an ongoing pattern of sexual abuse of the same victim under the age of 18 years, and (2) was an aggravated domestic violence offense. On counts 10 through 13 (molestation and rape involving Jack), the jury returned special verdicts making the same ongoing pattern of sexual abuse of a minor finding made on counts 1 through 6.

The trial court imposed an exceptional sentence of 360 months. It later entered written findings and conclusions in which it found that "any one aggravating factor found by the jury and/or the operation of the multiple offense policy" provided substantial and compelling reasons to justify the exceptional sentence. CP at 497.

Finally, the trial court imposed a total of $1,750 in legal financial obligations (LFOs).[4] Mr. Padgett made no objection. While the judgment and sentence included a boilerplate finding that Mr. Padgett had the ability to pay the LFOs, the court did not inquire on the record into Mr. Padgett's existing or projected financial circumstances.

---

[4] They comprised a $500 crime penalty assessment, a $100 DNA collection fee, a $200 criminal filing fee, a $600 court appointed attorney recoupment fee, a $100 domestic violence assessment, and a $250 jury fee.

Mr. Padgett appeals.

ANALYSIS

Mr. Padgett makes 17 assignments of error on appeal, which can be grouped into

eight categories: he argues (1) insufficient evidence supports the two convictions for

delivery of a controlled substance, (2) evidence of Candace's drug screen was non-

admissible hearsay that did not qualify for the business record exception and its

admission violated his constitutional confrontation rights, (3) because identical to-convict

instructions were used for multiple counts, he was exposed to double jeopardy, (4) the

trial court's instructions on the "ongoing pattern of sexual abuse against a minor"

aggravating factor was an unlawful comment on the evidence and relieved the State of its

burden of proof, (5) aggravated domestic violence is an alternate means factor and the

State failed to present sufficient evidence to establish each means, (6) the trial court

entered an unsupported finding of ability to pay LFOs, (7) the felony judgment and

sentence and warrant of commitment contain clerical errors, and (8) the trial court

engaged in impermissible judicial fact-finding in imposing an exceptional sentence. We

address Mr. Padgett's arguments in the categories and in the order set forth above.

*I. Sufficiency of evidence: delivery of a controlled substance*

Mr. Padgett claims there was insufficient evidence for the jury to find beyond a

reasonable doubt that he gave methamphetamine to Henry and Candace. In Henry's case,

he contends that no expert testimony identified the substance provided and Henry was too

7

inexperienced to reliably identify the substance as methamphetamine. In Candace's case, he contends there was insufficient evidence the methamphetamine she consumed in the days before the search was provided by him. In connection with both arguments, he points out that no drugs or evidence of drug use was found in the search of his home and that Jack and two other of Henry's friends testified they never saw drugs or drug use in the home.

When presented with an evidence sufficiency challenge, we examine "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Id.* We defer to the trier of fact on issues involving conflicting testimony, credibility of the witnesses, and the persuasiveness of the evidence. *State v. Hernandez*, 85 Wn. App. 672, 675, 935 P.2d 623 (1997).

In *State v. Colquitt*, 133 Wn. App. 789, 801, 137 P.3d 892 (2006), this court provided nonexclusive examples of evidence that should be considered in determining whether the State has met its burden of establishing that the substance delivered by a defendant was a controlled substance:

> (1) testimony by witnesses who have a significant amount of experience with the drug in question, so that their identification of the drug as the same as the drug in their past experience is highly credible; (2) corroborating

8

testimony by officers or other experts as to the identification of the substance; (3) references made to the drug by the defendant and others, either by the drug's name or a slang term commonly used to connote the drug; (4) prior involvement by the defendant in drug trafficking; (5) behavior characteristic of use or possession of the particular controlled substance; and (6) sensory identification of the substance if the substance is sufficiently unique.

Mr. Padgett claims the evidence in this case is comparable to that in *Colquitt*, which was found to be insufficient. Mr. Colquitt was convicted of possession of cocaine based on substance identification evidence consisting of the arresting officer's statement that the substance appeared to be rock cocaine and a field test that was positive for cocaine. *Id.* at 794. Without evidence that the officer had any experience and training enabling him to reliably identify the drug, the appellate court characterized the officer's identification as appearing to be pure conjecture. *Id.* at 800-02.

The State counters that this case is more like *In re Personal Restraint of Delmarter*, 124 Wn. App. 154, 101 P.3d 111 (2004), in which the court held that a positive field test by an officer, and a defendant's admission that the substances were heroin and cocaine were sufficient to uphold the defendant's convictions for possession of those substances.

We agree with Mr. Padgett that the State's evidence identifying the substance provided to Henry as methamphetamine is more like the evidence in *Colquitt*. Unlike in *Delmarter*, Mr. Padgett never confessed to giving Henry methamphetamine nor was any of the substance he provided available to be field tested. The State offered only Henry's

9

testimony that the substance was "meth"; that the first meth provided looked "white like little rocks," tasted "gross," and acted as a stimulant, causing him to stay awake all night; that he had seen Mr. Padgett use the drug intravenously; and that he had smoked the substance, wrapped in tinfoil, using a tube sticking out of a ball. RP at 780, 782. Absent evidence that Henry had any prior experience enabling him to recognize methamphetamine or expert testimony that his observations of the substance's appearance, use, and effects were consistent with methamphetamine, the State's evidence is insufficient to establish the substance provided by Mr. Padgett was methamphetamine. Mr. Padgett's conviction on that count must be reversed.

By contrast, Candace's testimony about her drug use and her friendship with Mr. Padgett's meth dealer, her reference to "all the rehabs" she had attended, and the history she provided to Dr. Rivas, established a basis on which she could reliably identify the drug provided to her as methamphetamine.[5] RP at 1094. Mr. Padgett's challenge to his conviction for delivery of the substance to Candace focuses on what he contends was the State's failure to prove that he provided the drug to her. But Candace testified as follows at trial:

Q. . . . [W]hy were you at Travis'?
A. Because he had meth.
Q. . . . [H]e had meth. Did Travis give you meth?

---

[5] The drug screen (whose admission we uphold below) is not necessary to establish Candace's ability to recognize the drug, but corroborates her testimony that she smoked methamphetamine with Mr. Padgett before police arrived to execute the warrant.

10

A.     Yeah.

RP at 1094. After establishing the time frame, the questioning continued:

Q.     . . . [Y]ou said that you went there because he had meth. Just for the record, when you say meth, is that methamphetamine?
A.     Yeah.
Q.     Was there any other reason why you were there?
A.     No.

RP at 1095. After testifying that she had been at Mr. Padgett's home for two days when officers arrived to execute the search warrant, she answered the following questions:

Q.     . . . Now, when the defendant, Mr. Padgett, gave you the meth, was that on one time or more than one time when you were there?
A.     More than one time.
Q.     Do you know how many times he gave you meth?
A.     No.

RP at 1095-96. Finally, she was asked about when she last used meth before the officers arrived to execute the search warrant:

Q.     . . . Had you had any meth before the police came over?
A.     Oh, yeah.
Q.     All right. And do you know about how much longer it was when the last meth was?
A.     Like a half an hour maybe.

RP at 1098.

Viewing this testimony in the light most favorable to the State, and deferring to the jurors' determinations about credibility and the persuasiveness of the evidence, the State did not need to support Candace's testimony with other evidence. Her testimony was sufficient to establish that Mr. Padgett provided her with methamphetamine.

11

No. 32927-5-III
*State v. Padgett*

## *II. Admission of Candace's drug screen*

Before calling emergency physician Rivas as a witness, the State, outside the presence of the jury, asked the court to rule on the admissibility of the drug screen he ordered, which tested positive for methamphetamine. The State represented that Dr. Rivas would lay the foundation to admit the drug screen as a business record. The defense objected that the record was a hospital record, not Dr. Rivas's record, and that the proper custodian was the person who created the record, not the doctor. The defense also complained that the drug screen was "testimonial." CP at 1180. The trial court ruled the drug screen admissible subject to the State laying the proper foundation for the business record exception, citing *State v. Garrett*[6] for support.

Hearsay is inadmissible unless it falls within an exception. ER 802. The Uniform Business Records as Evidence Act, RCW 5.45.020, provides an exception for business records because they "are presumptively reliable if made in the regular course of business and there was no apparent motive to falsify." *State v. Ziegler*, 114 Wn.2d 533, 538, 789 P.2d 79 (1990). For evidence to be admissible under the act, the business record must

> (1) be in record form, (2) be of an act, condition or event, (3) be made in the regular course of business, (4) be made at or near the time of the act, condition or event, and (5) the court must be satisfied that the sources of information, method, and time of preparation justify the admittance of the evidence.

---

[6] 76 Wn. App. 719, 887 P.2d 488 (1995).

*Id.* A trial court's decision admitting or excluding such records "is given much weight

and will not be reversed unless there has been a manifest abuse of discretion." *Cantrill v.

Am. Mail Line*, 42 Wn.2d 590, 608, 257 P.2d 179 (1953).

Our Supreme Court held in 1953 that "[a]s applied to hospital records, compliance

with the act obviates the necessity, expense, inconvenience, and sometimes impossibility

of calling as witnesses the attendants, nurses, physicians, X ray technicians, laboratory

and other hospital employees who collaborated to make the hospital record of the

patient." *Id.* "It is not necessary to examine the person who actually created the record

so long as it is produced by one who has the custody of the record as a regular part of his

work or has supervision of its creation." *Id.* In later cases, our Supreme Court has held

that a physician can lay the foundation for laboratory tests where they are included in a

medical file in the custody of the physician's clinic, clinic personnel ordered the tests and

rely on the lab's test results in treating patients, and the physician is familiar with the

laboratory and its testing procedures. *Ziegler*, 114 Wn.2d at 539-40. This court has

rejected any requirement that the foundation for a medical record be laid by someone

who supervises the individual who contributed a record to a patient's medical file.

*Garrett*, 76 Wn. App. at 725. In *Garrett*, the appellate court held that a patient's treating

physician could lay the foundation to admit records of an emergency room visit at which

the treating physician was not present. *Id.* Because the medical reports were signed and

13

dated by the individuals who made them, the time of their preparation relative to the events recorded was demonstrated. *Id.*

Here, Dr. Rivas testified that he treated Candace early in the morning on January 18, 2013. He testified that he ordered a drug screen after learning she had used methamphetamine the prior day, marijuana in the past week, and two other illicit drugs in the past year, explaining, "I wanted to ascertain what was in her system at that point." RP at 1190. He testified that drug screens are done in the regular course of business and are ordered from the emergency room "dozens of times a day." RP at 1191. He explained the process for collecting the patient's urine sample used for a drug screen, and how it is transmitted to the hospital's laboratory where it is run through "a machine, an analyzer of sorts, that detects the various drug levels in the sample." *Id.* He testified that the process is completed, with results back, within 30 to 40 minutes.

The medical chart from which Dr. Rivas testified does not appear to have been offered as an exhibit,[7] but he mentioned twice that he had the medical chart with him on the witness stand and testified that Candace's drug screen was positive for

---

[7] No objection was made at trial to the failure to offer the record itself into evidence, nor does Mr. Padgett attempt to raise an issue on that score for the first time on appeal. *See* RAP 2.5(a).

14

methamphetamines and marijuana. The foundation was sufficient to establish the business record exception.[8]

Mr. Padgett next contends the trial court violated his constitutional confrontation rights when it admitted evidence of the drug test without the testimony of the technician who conducted the test, but he fails to demonstrate that the drug screen results were testimonial. "Only testimonial statements 'cause the declarant to be a "witness" within the meaning of the Confrontation Clause.'" *State v. Wilcoxon*, 185 Wn.2d 324, 331, 373 P.3d 224, *cert. denied*, ___ U.S. ___, 137 S. Ct. 580, 196 L. Ed. 2d 455 (2016) (quoting *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)). Various formulations of what makes a statement "testimonial" exist; a relatively recent one is that "a statement is testimonial when 'the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" *State v. Lui*, 179 Wn.2d 457, 473, 315 P.3d 493 (2014), *review granted*, 186 Wn.2d 1008, 380 P.3d 504 (2016) (quoting *Davis*, 547 U.S. at 822). The United

---

[8] Mr. Padgett cites *State v. Nation*, 110 Wn. App. 651, 41 P.3d 1204 (2002) and *State v. Hopkins*, 134 Wn. App. 780, 142 P.3d 1104 (2006) in support of an argument that the technician who conducts a drug screen must be identified and testify for its result to be admissible under Washington statutes and court rules. Neither case is on point. In *Nation*, an expert's opinion testimony was excluded because the foundation required by ER 703 was not established and the record urged to be a business record failed to comply with requirements of a criminal rule, CrR 6.13(b). In *Hopkins*, the required foundation as to how the record was made—a matter that the appellate court viewed as "potentially very significant"—was lacking. 134 Wn. App. at 789.

States Supreme Court noted in a footnote in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), that medical reports created for the purpose of treatment are nontestimonial.

Nonetheless, citing *Melendez-Diaz* and *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011)—both of which involved forensic analyses by state crime laboratories—Mr. Padgett argues that Dr. Rivas "was well aware" that any drug test he ordered would become evidence in a criminal investigation, making the results testimonial. Br. of Appellant at 32. But Dr. Rivas never testified that he ordered the drug screen at the behest of police, or because he personally intended for it to be available for a prosecution purpose, or even, as Mr. Padgett argues, that he knew it would be used for prosecuting a delivery of a controlled substance charge. Rather, Dr. Rivas testified that because he was dealing with "a 14-year-old girl who is giving a lot of these sort of high-risk behaviors that she's participating in . . . I wanted to ascertain what was in her system at that point." RP at 1190. Dr. Rivas's only testimony to his understanding about why police had brought Candace to the hospital was that police were contacted after she revealed to her 17-year-old boyfriend that a man who "was like 30's, 40 years old, had performed oral sex on her." RP at 1189.[9]

---

[9] The only evidence of a police role in the drug screen was Detective Durbin's testimony, unsupported by other evidence, that he ordered officers to take Candace to the hospital not only for a sexual assault examination but also for a drug screen. There was no evidence that Dr. Rivas was aware of the detective's intent.

16

The results of the drug test were not testimonial, and the trial court did not violate Mr. Padgett's confrontation right by admitting them.

### III. Double jeopardy

Where a defendant is charged with multiple counts of the same crime, vague jury instructions, coupled with evidence and argument that fail to make it manifestly apparent that the State is not seeking to impose multiple punishments for a single offense, violate federal and state constitutional guarantees against double jeopardy. *See* U.S. CONST. amend. V; WASH. CONST. art. I, § 9. "A double jeopardy claim is of constitutional proportions and may be raised for the first time on appeal." *State v. Mutch*, 171 Wn.2d 646, 661, 254 P.3d 803 (2011).

When reviewing this type of claimed violation of the constitutional guarantee against double jeopardy, we engage in a two-step, de novo review. We first consider whether the jury instructions given were flawed and could have permitted the jury to convict a defendant of multiple counts based on a single act. *Id.* at 661-63. If the instructions are flawed, we then examine the entire trial record (the evidence, the arguments, and the instructions)—and do so rigorously, in favor of the defendant—to ascertain whether there are potentially redundant convictions. *Id.* at 664. "[I]f it is not clear that it was '*manifestly apparent* to the jury that the State [was] not seeking to impose multiple punishments for the same offense' and that each count was based on a separate act, there is a double jeopardy violation." *Id.* (second alteration in original)

17

(quoting *State v. Berg*, 147 Wn. App. 923, 931, 198 P.3d 529 (2008), *overruled on other grounds by State v. Mutch*, 171 Wn.2d 646 (2011)).

Three instructions given to the jury in this case are relevant. The first, based on 11 WASHINGTON PRACTICE: PATTERN JURY INSTRUCTIONS: CRIMINAL 3.01, at 80 (3d ed. 2008) (WPIC), provided:

> A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other counts.

CP at 166 (Jury Instruction 2). It is settled law that this instruction alone is insufficient to safeguard against a violation of double jeopardy, because it does not explain to jurors that each "crime" requires proof of a different act. *Mutch*, 171 Wn.2d at 663 (citing *State v. Borsheim*, 140 Wn. App. 357, 367, 165 P.3d 417 (2007)). The court in *Mutch* suggested that the separate act requirement can be explained to jurors by "sufficiently distinctive 'to convict' instructions or an instruction that each count must be based on a separate and distinct criminal act." *Id.* at 662.

In Mr. Padgett's trial, a series of jury instructions informed the jury of the separate act requirement, *e.g.*:

> The State of Washington alleges that the defendant committed acts of Third Degree Rape of a Child on multiple occasions. To convict the defendant on any count of Third Degree Rape of a Child, one particular act, a separate and distinct act, of Third Degree Rape of a Child must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of Third Degree Rape of a Child.

18

CP at 175 (Jury Instruction 11); *see also* CP at 178, 196 (parallel instructions for the first degree incest and third degree molestation counts).

The "to-convict" instructions for third degree rape, first degree incest, and third degree molestation repeated the requirement of a "particular" and "separate and distinct act," *e.g.*:

> To convict the defendant on any count of Third Degree Rape of a Child, one particular act, a separate and distinct act of Third Degree Rape of a Child must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved.

CP at 176, 180, 182, 197, 199 (Jury Instructions 12, 16, 18, 33, 35); *see also* CP at 179, 181, 183, 195, 198, 200 (parallel instructions for the first degree incest and third degree molestation counts).

Mr. Padgett argues that these instructions, even collectively, "failed to make manifestly apparent that each conviction must be predicated on both a separate and distinct act *and* that proof of one act cannot support a finding of guilt on more than one count." Br. of Appellant at 36. We disagree. No reasonable juror reading the instructions given in this case could believe, for example, that he or she could find Mr. Padgett guilty of all of counts 1, 2, and 3 based on proof of a single act of third degree rape of a child. The court's instructions protected Mr. Padgett against multiple convictions for a single act.

19

Were we not satisfied that the jury instructions were sufficient to protect against double jeopardy, rigorous review of the entire trial record would satisfy us that there could be no double jeopardy violation. In closing argument, the prosecutor not only identified the factual basis for each count, but cautioned jurors repeatedly about the need to unanimously agree on the specific act charged with respect to each count. *See State v. Peña Fuentes*, 179 Wn.2d 808, 318 P.3d 257 (2014) (finding no double jeopardy violation where, in closing, the State identified separate, specific acts supporting each count, and the defendant did not challenge the number of incidents or whether they overlapped). Mr. Padgett has not been punished multiple times for the same criminal act.

### IV. Instruction from former WPIC 300.17, addressing "prolonged period of time"

The State's charging documents included special allegations that Mr. Padgett's sexual offenses were "part of an ongoing pattern of sexual abuse of the same victim under the age of eighteen years manifested by multiple incidents over a prolonged period of time." CP at 14-19. On the basis of that aggravating circumstance, if found by the jury, the trial court was authorized to impose an exceptional sentence. RCW 9.94A.535(3)(g). The charging documents also included special allegations that Mr. Padgett's sexual offenses against Henry were aggravated domestic violence offenses under RCW 9.94A.535(3)(h)(i), which similarly required the jury to determine whether the offenses were part of such a pattern manifested by multiple incidents over a

20

"prolonged period of time"—a finding that would similarly provide a basis for exceptional sentencing.

The court's instructions to the jury included an instruction derived from a former version of WPIC 300.17 that told jurors "[t]he term 'prolonged period of time' means more than a few weeks." CP at 205 (Jury Instruction 40). In *State v. Brush*, 183 Wn.2d 550, 557, 353 P.3d 213 (2015), our Supreme Court held that whether or not a period of time qualifies as "prolonged" is a question of fact, and that to instruct the jury that "'prolonged period of time' means more than a few weeks" unlawfully comments on the evidence in violation of the Washington Constitution. Given the court's unlawful instruction, Mr. Padgett asks us to reverse his exceptional sentence and remand with instructions to (if requested) impanel a jury to determine whether the evidence established a prolonged period of time under proper instructions.

Remand is not required in this case, however, because the trial court identified an independently sufficient basis for imposing an exceptional sentence. We may uphold an exceptional sentence if any of the sentencing court's reasons for imposing the sentence are valid. *State v. Gaines*, 122 Wn.2d 502, 512, 859 P.2d 36 (1993). Reversal is only required if it is not clear whether the sentencing court would have imposed the same sentence based on valid factors alone. *Id.*

The court's findings in support of the exceptional sentence included the following:

21

33.     The Defendant's offender score on each count is in excess of 9:
        Count 1: (29); Count 2: (29); Count 3: (29); Count 4: (29); Count 5:
        (29); Count 6: (29); Count 7: Gross Misdemeanor; Count 8: [(]11);
        Count 9: (11); Count 10: (29); Count 11: (29); Count 12: (29); Count
        13: (29).

CP at 494-95.

Its conclusions of law included the following:

2.      The Court has the authority to enter an exceptional sentence based
        upon consecutive sentences on counts.
        . . . .
4.      The Defendant's high offender score based upon multiple current
        offenses would result in some of the offenses going unpunished.
5.      The Court has the authority to impose an aggravated sentence
        without a finding of fact by the jury under this circumstance.

CP at 495.

Based on its findings and conclusions, the court ordered "that any one aggravating

factor found by the jury *and/or the operation of the multiple offense policy pursuant to*

*RCW 9.94A.535(g)*[10] is sufficient to justify the exceptional sentences entered by the

Court." CP at 497 (emphasis added). We need not vacate the exceptional sentence, since

_____

[10] Given the findings and conclusions, it is evident that the court's reference to RCW 9.94A.535(g) is a scrivener's error. RCW 9.94A.535**(1)**(g) provides mitigating circumstances where the operation of the multiple offense policy results in a sentence that is clearly *excessive*. We infer that the court meant to cite RCW 9.94A.535(2)(c), which provides for an exceptional sentence imposed by the court where the defendant's multiple offenses and high offender score would result in some current offenses going unpunished. A sentencing court's finding of this basis for an exceptional sentence does not violate the right to a jury trial. *State v. Alvarado*, 164 Wn.2d 556, 567, 192 P.3d 345 (2008).

We direct the court to clarify the basis for the exceptional sentence at the time of resentencing.

22

it is clear the court would have imposed the same sentence on the basis of the multiple

offense policy had it not been imposed on the basis of aggravating circumstances whose

proof could have been affected by the court's unlawful comment on the evidence.

*V. Alleged alternative means of committing aggravated domestic violence*

Since we uphold the exceptional sentence on the basis of the multiple offense

policy provided by RCW 9.94A.535(2)(c), we need not address Mr. Padgett's argument

that the State failed to prove each of what he contends are "alternative means" of

committing aggravated domestic violence.

*VI. LFOs*

Mr. Padgett argues that the trial court erred when it imposed LFOs without

conducting an individualized inquiry into his ability to pay. As a preliminary matter, we

consider whether to accept review of the issue. Mr. Padgett made no objection to the trial

court's finding that he had the present and future ability to pay and thereby failed to

preserve a claim of error. RAP 2.5(a); *State v. Blazina*, 182 Wn.2d 827, 833, 344 P.3d

680 (2015) ("[u]npreserved LFO errors do not command review as a matter of right"). A

majority of the panel favors exercising our discretion under RAP 2.5(a) to review the

issue.

Under RCW 10.01.160(3), "[t]he court shall not order a defendant to pay costs

unless the defendant is or will be able to pay them."

Practically speaking, this imperative under RCW 10.01.160(3) means that the court must do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry. The record must reflect that the trial court made an individualized inquiry into the defendant's current and future ability to pay. Within this inquiry, the court must also consider important factors, as amici suggest, such as incarceration and a defendant's other debts, including restitution, when determining a defendant's ability to pay.

*Blazina*, 182 Wn.2d at 838. This statutory inquiry is required only for discretionary LFOs. *State v. Clark*, 191 Wn. App. 369, 373, 362 P.3d 309 (2015) (citing *State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013)), *remanded to superior court*, ____ Wn.2d ____, 388 P.3d 487 (2017).

Of the LFOs imposed, only $950 worth were discretionary: a $600 court appointed attorney recoupment (RCW 9.94A.760), a $100 domestic violence assessment (RCW 10.99.080), and a $250 jury fee.[11] RCW 7.68.035; RCW 43.43.7541; RCW 36.18.020(h). The trial court entered only a boilerplate finding that Mr. Padgett had the ability to pay the LFOs. Because such a finding is insufficient under *Blazina*, we direct the trial court to conduct the proper inquiry at the resentencing.

*VII. Clerical errors*

Mr. Padgett identifies two clerical errors that he requests be corrected. The first is

---

[11] It is unclear whether the jury fee is mandatory or discretionary. *See State v. Clark*, 195 Wn. App. 868, 872 & n.1, 381 P.3d 198 (2016), *remanded to superior court*, No. 93740-1 (Wash. Feb. 8, 2017). As the parties do not address its character, we assume for purposes of this opinion that it is discretionary.

24

in the judgment and sentence, which states:

> **2.2** **Special Findings:** The Court makes the following special findings, based upon special verdicts:
>
> ☒ Counts 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12 and 13, do not encompass the same criminal conduct and **do not count as one crime** in determining offender score, pursuant to RCW 9.94A.589.

CP at 467. Mr. Padgett points out, and the State concedes, that the record does not contain a special verdict finding that each of the above listed counts encompass different criminal conduct.

The second error Mr. Padgett identifies is in the warrant of commitment, which states that Mr. Padgett was convicted of count 14. As the State again concedes, the jury did not find Mr. Padgett guilty on count 14.

We accept the State's concessions and direct the trial court to correct the clerical errors at the time of resentencing.

### *VIII. Alleged* Blakely *error in finding substantial and compelling reasons for an exceptional sentence*

Finally, Mr. Padgett argues the trial court violated his right to a jury trial by concluding that substantial and compelling reasons justified an exceptional sentence and making supporting findings.

The United States Supreme Court has established that "[o]ther than . . . a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

25

*Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000);

*Blakely v. Washington*, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

The Washington Supreme Court has found that "*Blakely* left intact the trial judge's

authority to determine whether facts alleged and found are sufficiently substantial and

compelling to warrant imposing an exceptional sentence under RCW 9.94A.535. That

decision is a legal judgment which, unlike factual determinations, can still be made by the

trial court." *State v. Hughes*, 154 Wn.2d 118, 137, 110 P.3d 192 (2005), *overruled on*

*other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d

466 (2006); *State v. Suleiman*, 158 Wn.2d 280, 291, 143 P.3d 795 (2006).

RCW 9.94A.535 provides: "Whenever a sentence outside the standard sentence

range is imposed, the court shall set forth the reasons for its decision in written findings

of fact and conclusions of law." In *State v. Friedlund*, 182 Wn.2d 388, 394, 341 P.3d 280

(2015) our Supreme Court held that in order to support the trial court's conclusion of

substantial and compelling reasons for an exceptional sentence, the written findings

provision of the Sentencing Reform Act of 1981, chapter 9.94A RCW, "requires exactly

that—*written* findings."

Decisions by our Supreme Court are binding on all lower courts in the state. *1000*

*Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 578, 146 P.3d 423 (2006). It

would be error for us to fail to follow our Supreme Court's directly controlling authority.

Mr. Padgett can seek review by the Supreme Court.

26

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Padgett raises two, both of which complain of the trial court's denial of his trial lawyer's motion to continue his October 2013 trial. Mr. Padgett individually objected to the several continuances requested by his trial lawyer, but now argues that the last continuance his lawyer requested was necessary (1) to conduct an independent DNA analysis on the saliva sample taken from him two months before trial, and (2) to gather more evidence, such as a drug or hair follicle test, to show that Mr. Padgett was not using drugs.

Mr. Padgett argues the State violated CrR 4.7(h)(2) by producing the DNA results so close to the time of trial (too late for independent testing) and the trial court should have granted his lawyer's motion for a continuance as a sanction for the State's asserted violation of the criminal rule. He does not identify where, in the record, his lawyer ever asked that the continuance be imposed as a sanction for violation of the rule. If no such request was ever made, the issue is unpreserved. RAP 2.5(a). Assuming a request for such a sanction was made and denied, Mr. Padgett must show not only an abuse of discretion by the court, but also actual prejudice. "Absent some showing of actual prejudice, we will not interfere with the trial court's exercise of discretion in denying sanctions pursuant to CrR 4.7(h)(7)(i)." *State v. Bradfield*, 29 Wn. App. 679, 682, 630 P.2d 494 (1981).

27

Mr. Padgett does not show prejudice. The DNA evidence about which he complains showed he used three dildos that he conceded were his, and that he told jurors were used by him and his girlfriend. As his trial lawyer stated in opposing the request for a saliva sample, "I still don't see that Mr. Padgett's DNA is relevant. It's the victims [sic] that is relevant." RP (Aug. 2, 2013) at 36.

The only prejudicial information found by the crime lab was a mixture of DNA on one of the dildos that it concluded included Henry as a possible contributor. While this evidence corroborates Henry's testimony, it was hardly important to the State's case. The defense argued that it actually detracted from the State's case, because Mr. Padgett testified that he caught Henry and Jack playing with the dildo (hence Henry's DNA), and if there had been as much sexual contact as Henry claimed, one might have expected his DNA to be on more than one of Mr. Padgett's sex toys. Ultimately the case came down to whether the jury found Mr. Padgett or Henry and Jack to be more credible—and the jury believed Henry and Jack.

As far as the follicle drug test is concerned, Mr. Padgett offers no excuse for why that test could not have been conducted long before his lawyer's final, October 4, 2013 request for a further trial continuance—and to be relevant, it probably needed to be. Mr. Padgett does not establish that such a test, if conducted after October 4, would have produced evidence to show that Mr. Padgett was not using drugs at the time of the crimes

28

charged, which occurred between May 2011 and January 31, 2013—at least eight months before. Again, no prejudice is shown.

Because Mr. Padgett does not show prejudice, we need not address whether denying a fifth continuance was a proper exercise of the court's discretion.

We vacate Mr. Padgett's conviction for delivery of methamphetamine to Henry (count 8), affirm his remaining convictions, and remand for resentencing consistent with this opinion.[12]

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Fearing, C.J.

Pennell, J.

---

[12] Mr. Padgett moved this court to waive costs if he did not prevail on appeal. Because he has prevailed in part, the issue is moot.